[No. 28688.   Department One.   September 30, 1942.]

*In the Matter of the Estate of* IDA BOTTGER, *Deceased.* HERMAN BOTTGER *et al., Respondents,* v. CHARLOTTE BOTTGER, *Appellant.*[1]

[1]Reported in 129 P. (2d) 518.

*Clyde H. Belknap,* for appellant.

*A. O. Colburn* and *Orville W. Duell,* for respondents.

STEINERT, J.—Upon the admission to probate of the purported will of Ida Bottger, deceased, five of her children and four of her grandchildren filed in the pending probate cause a petition seeking to have the decedent's will declared null and void and the probate thereof revoked, and further seeking to have set aside two deeds which the decedent had executed a year or more before her death. The petition was directed against Harry Bottger, another child of the decedent, who was named as executor and the principal beneficiary in the will and as sole grantee in each of the two deeds. The prayer of the petition was based upon allegations that, at the time of executing the purported deeds and will, the decedent was of unsound mind and unable to comprehend the nature of her acts, and was, furthermore, acting under undue influence exerted upon her by Harry Bottger and his wife, Charlotte Bottger.

Shortly after the filing of the petition contesting the will and attacking the deeds, Harry Bottger died, and his wife, to whom he had left the bulk of his property, was thereafter appointed administratrix with the will annexed of the estate of Ida Bottger and was in consequence thereof substituted as defendant in the contest proceeding. In her answer to the petition herein, Charlotte Bottger denied the allegations of testamentary incapacity on the part of Ida Bottger and of undue influence exerted upon her, and affirmatively alleged that all of the petitioners had, prior to Ida Bottger's death, executed quitclaim deeds conveying to Harry Bottger

any interest then held or thereafter acquired by them in the property theretofore conveyed by the two deeds from Ida Bottger to Harry Bottger, and that petitioners were therefore estopped to question the validity of the conveyances from Ida Bottger to her son.

Petitioners replied, alleging that these quitclaim deeds were executed and delivered by them upon the understanding and agreement between themselves and Harry Bottger that Ida Bottger, then still alive, had not made, and would not make, a will disinheriting the petitioners, and that the estate of Ida Bottger, with the exception of the property theretofore conveyed by her to her son Harry, should be divided equally among the parties to the agreement. The contest proceeding was tried to the court, sitting without a jury, and resulted in a decree canceling the purported will, setting aside the deeds and quitclaim deeds, revoking Charlotte Bottger's letters of administration with the will annexed, and appointing a special administrator of the estate of Ida Bottger. The defendant, Charlotte Bottger, has appealed.

Ida Bottger, the decedent referred to in this action, was born in Germany in 1847 and died in this state on January 2, 1941. She came to this country when she was about fifteen years of age, later met and married one John F. Bottger, a middle western farmer, and for many years thereafter lived and worked with him upon a farm in the state of Iowa. They had nine children: Herman, Charles, Jesse, William, George, Harry, Hannah (Hoft), Belle (Wynia) and Rose (Nye). Herman was the oldest of the children, Harry was the youngest. Rose died sometime prior to 1939, leaving as heirs two children, Robert Nye and Betty Straw (referred to in the title of the case as "Belle Shaw," and at times in the record as "Betty Shaw"). Jesse, a bachelor, died July 13, 1939, about eighteen

months prior to the death of his mother, and, as will hereinafter more fully appear, the present litigation is the consequence of his demise. Charles died on October 9, 1939, leaving two sons, Laurence and Howard. Harry Bottger died April 8, 1941, subsequent to the death of his mother but after the present action had been commenced. Ida Bottger's five presently surviving children (Herman, William, George, Hannah, and Belle) and the four grandchildren (Robert, Betty, Laurence and Howard) are the respondents in this action.

About the year 1900, the entire Bottger family moved from Iowa to Spokane county in this state, although not all of them came at the same time. John and Ida Bottger, the father and mother, finally settled on a farm on Half Moon prairie, near the city of Spokane, where they both lived until John Bottger's death in 1914 and where Ida Bottger continued to reside until her death in 1941.

Prior to the time of John Bottger's death, the son Jesse owned and occupied a farm not far distant from the home of his parents. After his father's death, Jesse moved in with his mother and from that time on operated the home place together with his own farm. In addition to his farming operations, he also engaged in the vocation of auctioneer throughout the surrounding region. He appears to have been very successful in his ventures, accumulating an estate of over $17,000, consisting of land, securities, and cash on deposit in a number of banks. He took good care of his mother and concededly was the favorite among her children, although she seems to have been quite fond of all her other children and of her grandchildren as well. The general family relations appear to have been amicable until the time of Jesse's death.

Some time in the year 1922, Jesse Bottger and his mother became acquainted with appellant Charlotte Bottger, who was then an unmarried woman. At various times thereafter, and until her marriage to Harry Bottger in 1938, she worked for Jesse in a traveling cookhouse which he used in connection with his harvesting operations, and at other times she worked as a domestic for Ida Bottger in the latter's home.

Jesse Bottger died intestate on July 13, 1939, and his brothers and sisters at first apparently thought that they were all entitled to share in his estate. At the instance of William Bottger, however, they consulted Mr. Clyde H. Belknap, the attorney now representing appellant, and were advised by him that their mother, Ida Bottger, to whom we shall hereinafter frequently refer simply as "Mrs. Bottger," was Jesse's sole heir. Mrs. Bottger, however, did not wish to act as administratrix, and upon her petition Herman and Harry, the oldest and youngest of her children, were appointed coadministrators of Jesse Bottger's estate. At that time, Herman was employed by an industrial concern in Spokane, and Harry, who had married Charlotte about a year before, was operating a rented farm about ten miles distant from his mother's place.

On the day following Jesse's death, Charlotte, at the request of Mrs. Bottger, who was then ninety-two years of age, moved into the latter's home and continued to reside there until the elderly lady's death. Charlotte was not hired to come there, nor was she ever paid anything for the services which she rendered. In October, 1940, Harry rented and moved onto a farm near his mother's home, taking a year's lease thereon, and during that period of time did a good deal of work on the farm occupied by Mrs. Bottger. Sometime in

that same year he moved in with his wife and mother and lived on the home place until his death in 1941.

Meanwhile, in September, 1939, Ida Bottger concluded to convey to Harry the home place and also a farm which she had inherited from Jesse, these two farms being valued at about four thousand dollars. Contemplating that disposition, she consulted Mr. Belknap, who advised her not to give away her property in her lifetime but rather to dispose of it by will. She was further told to think the matter over carefully before making any final decision. She returned to Mr. Belknap's office about a week later, September 18, 1939, but had not altered her original intention. She thereupon executed a deed conveying to Harry the farm which she had inherited from Jesse. She could not convey the home farm at that time, simply because the record title was in John F. Bottger, her husband, and his estate had never been probated. She therefore petitioned the court for letters of administration upon her husband's estate to be issued to her son Harry, and shortly thereafter obtained an order of court setting aside to herself that entire estate in lieu of homestead and other exemptions provided by law. She then, on October 16, 1939, conveyed the home place to Harry. These are the two conveyances which have been subjected to attack by respondents in this action.

On February 5, 1940, Mrs. Bottger executed the will here in question, bequeathing ten dollars to each of the respondents and leaving to Harry the residue of her estate, which for the most part consisted of the inheritance derived from Jesse's estate. The circumstances under which that will was executed constitute the principal basis of the present proceeding and will be detailed later.

Three days before the execution of the will, the respondents Herman, George, and William Bottger, Belle

Wynia, and Hannah Hoft, children of Ida Bottger, signed a petition for the appointment of a trust company to act as guardian of their mother's estate, alleging that she was no longer competent to manage it herself. This petition was filed on February 15, 1940, and a copy of the notice of the application was served on her personally two days later. The record indicates that respondents were not aware, at the time of initiating the guardianship proceeding, that their mother had previously made a will, and, on the other hand, it is equally clear that when Mrs. Bottger executed the will she did not know that the guardianship petition had been filed, although she did know that some such proceeding was under consideration by some of the respondents.

Upon receiving notice of the application for the appointment of a guardian, Mrs. Bottger became very much incensed and determined to resist it. She consulted Mr. Belknap and he at once made preparation to contest the charge of incompetency. The cause was set down for trial, but on the day of hearing and shortly before the case was to be called, Mrs. Bottger, being greatly distressed by the situation, importuned Mr. Belknap to settle the matter without a trial. She stated to him:

"It will kill me to go on the stand and testify. . . . I would rather die than go in there and go through with this proceeding, to have my own children in there trying to make out that I am crazy."

Mr. Belknap endeavored to convince her that it was not the purpose of that proceeding to have her adjudged insane, but only to have her declared incompetent to manage her estate. His explanation did not seem to reassure her, however, for she said to him that "incompetent was just a lawyer's word for crazy." After some negotiations among the parties concerned in the

proceeding, the matter was compromised, with the result that on April 1, 1940, an order was entered appointing one W. S. Brant as guardian and directing that Mr. Belknap, who had represented Mrs. Bottger, and Mr. A. O. Colburn, who had represented the petitioners, should act jointly as attorneys for the guardian. The order of appointment was based upon a recital to the effect that it appeared to the court that Ida Bottger was a widow over ninety-two years of age, that she could not read or write the English language, that she had never had any business experience of any kind, that she had consented to the appointment of the guardian, and that in the opinion of all interested parties some one familiar with business matters should act as such. Mr. Brant, who was a banker and businessman of long experience, had been a friend and close associate of Jesse Bottger for many years and was also well known to Mrs. Bottger. After his appointment, Mr. Brant administered the guardianship estate, paying Mrs. Bottger, during the remainder of her lifetime, the sum of fifty dollars a month for living expenses.

Mrs. Bottger died on January 2, 1941. On January 21st, the will here involved was admitted to probate upon the petition of Harry Bottger, who was duly appointed executor. Shortly thereafter, the present proceeding was instituted by respondents. Upon Harry's death, his wife was appointed administratrix of Ida Bottger's estate and was substituted as defendant in the contest proceeding. Upon a trial of the issues then joined, the court entered the decree referred to above.

The facts thus far stated are largely undisputed and provide the background against which the evidence, hereinafter more fully detailed, must be considered. The two fundamental issues involved in this appeal are (1) whether Ida Bottger had sufficient testamen-

tary capacity to execute the will here in question, and (2) whether the will was executed as the result of undue influence exerted upon her. The trial court found against appellant upon both issues.

The rules as to what constitutes testamentary capacity have been stated, and the earlier cases collected, in a number of our recent decisions: *In re Larsen's Estate,* 191 Wash. 257, 71 P. (2d) 47; *Dean v. Jordan,* 194 Wash. 661, 79 P. (2d) 331; *In re Schafer's Estate,* 8 Wn. (2d) 517, 113 P. (2d) 41; *In re Miller's Estate,* 10 Wn. (2d) 258, 116 P. (2d) 526.

Those cases hold that a person is possessed of testamentary capacity if at the time he assumes to execute a will he has sufficient mind and memory to understand the transaction in which he is then engaged, to comprehend generally the nature and extent of the property which constitutes his estate and of which he is contemplating disposition, and to recollect the objects of his bounty. This is the standard by which courts must measure the facts of each case in which it is contended that an instrument offered or accepted as the will of a decedent was executed at a time when the testator lacked capacity to make a valid testamentary disposition of his property.

Furthermore, the cases above cited announce certain principles and lay down certain rules as guides to courts in determining the allocation of the burden of proof in such matters. The right to dispose of one's property by will is a valuable one, assured by law. Consequently, where a will, rational on its face, is shown to have been executed in legal form, the law presumes that the testator had testamentary capacity and that the will speaks his wishes. If the will has been probated and is thereafter contested, the burden of proving its illegality is, by statute (Rem. Rev. Stat.,

§ 1387 [P. C. § 10019]), imposed upon the person contesting such probation, and, according to the above decisions, that burden can be met only by producing clear, cogent, and convincing evidence of the invalidity of the will.

We now turn to the evidence adduced upon the issue of Mrs. Bottger's testamentary capacity. Clyde H. Belknap, the attorney referred to above, testified as follows: On February 5, 1940, in the forenoon, Mrs. Bottger, accompanied by her son Harry and her daughter-in-law Charlotte, came to his office and informed him that she wanted to have her will drawn. Mr. Belknap thereupon took her into his private office and discussed the matter with her at length. She gave him the names of her children and grandchildren, told him of her property and of what it consisted, and stated specifically the terms upon which the will was to be drawn, giving her reasons for disposing of her property as then directed. Mr. Belknap dictated the will in her presence and, after it had been transcribed, read it to her slowly, paragraph by paragraph. She expressed her approval of its form and contents. With her consent, Mr. Belknap then went to an adjoining office to procure Mr. Tustin, who is also an attorney, to act as a subscribing witness. Mr. Tustin suggested that, in view of the fact that the will might later be questioned, it would be well to have Mrs. Bottger examined by medical specialists and, if she were found competent, to have them act as subscribing witnesses. The suggestion was conveyed to Mrs. Bottger, and she agreed to comply with it. She was then asked whether she had any preference as to medical specialists and replied that she had none. Mr. Belknap then called Dr. Austin J. O'Leary and arranged to have him and Dr. Marjorie Heitman examine Mrs. Bottger that

afternoon. Accompanied by Harry and Charlotte, Mrs. Bottger immediately went to Dr. O'Leary's office and soon after her arrival was given an examination by the two specialists as hereinafter more fully related.

The respondents offered the testimony of ten lay witnesses to prove that Mrs. Bottger was incompetent to execute a will. Of these, five testified explicitly that Ida Bottger was, in their opinion, mentally incompetent on February 5, 1940, when the will now under consideration was executed, while the others merely testified to incidents from which it is claimed that incompetency may be inferred. Several of these latter witnesses testified generally that Mrs. Bottger could not read or write English, that she had never had business experience, that she never left the farm unless accompanied by someone else, and that her cooking had deteriorated in recent years and she sometimes served rancid butter and spoiled fruit. We do not think that these things, or any of them, even if true, constitute evidence of mental incompetency. One does not have to be a literarian, a financial genius, an athlete, or an expert cook in order to qualify as possessing capacity to make a will. If he is possessed of the qualifications stated above, that is sufficient.

There was also testimony, adduced by respondents, that on several occasions the testatrix did not immediately recognize old friends or members of her family. Some of these persons, however, had not seen her for some time, while as to the rest it is admitted that she recognized them when they spoke to her, the delay in identifying them being due to the fact that her eyesight was poor. Even if there were no evidence to the contrary with reference to that particular failing, we would at most regard the testimony concerning it as only slightly indicative of incompetency.

Several of respondents' witnesses testified that in recent years Mrs. Bottger usually spoke disconnectedly, losing the train of her thought, and that she began to speak brokenly, lapsing into German at frequent intervals. They further stated that she became childish and seemed unable to comprehend what was said to her in conversation. All this was controverted, however, by evidence which will be referred to later.

The lay witnesses called by respondents in presenting their case in chief were: O. A. Colburn, their attorney (who did not testify on the issue of competency); respondents William, Herman, and George Bottger; Gladys Harrison, Herman's daughter; Francis Harrison, Herman's son-in-law; Daniel Wynia, husband of respondent Belle Wynia; Clarence Wynia, Belle's son; Julius Coburn, whose sister married Belle's son; J. J. Jones, one of Ida Bottger's neighbors; and W. S. Brant, who was appointed guardian of Mrs. Bottger's estate. Of these, only the last two, and possibly Julius Coburn, can be regarded as truly disinterested witnesses. It will be observed that only three of the nine respondents are included in this list of persons who testified. Respondent Belle Wynia testified in rebuttal, but not as to the issue of testamentary capacity.

The five lay witnesses who testified that Ida Bottger was incompetent to make a will were Gladys Harrison, Francis Harrison, Daniel Wynia, J. J. Jones, and W. S. Brant. Not one of the four respondents who appeared as witnesses testified explicitly that their mother was mentally incompetent. Of the five witnesses just named, only Gladys Harrison had ever had any real opportunity to observe the testatrix and form an opinion on this matter. She testified that her grandmother was not possessed of testamentary capacity on February 5, 1940, but she also stated that she visited

her grandmother only twice after Jesse Bottger's funeral in July, 1939, the last time being on or about October 11, 1939. Her husband, Francis Harrison, testified that the decedent was incompetent at the time of making her will, but he seems never to have talked to her subsequent to July, 1939. Daniel Wynia visited his mother-in-law only at intervals of every three or four years and last saw her on October 2, 1937. He testified that she was not then competent to make a will, but gave no basis in fact for his opinion, except that she did not recognize him.

This brings us to the testimony of the two disinterested witnesses who testified that Ida Bottger was not mentally competent. The trial judge placed considerable reliance upon their testimony, so it will be considered at some length. J. J. Jones lived two and a half miles from the Bottger place and visited there quite often in connection with his insurance business. During the period with which we are particularly concerned, however, he saw Ida Bottger only twice. The first of these occasions was soon after Jesse Bottger's death in July, 1939. Jones called at the farm and told Mrs. Bottger that her insurance had expired and that he would like to renew it. She then advised him to see "the rest" (which the witness took to mean Harry or the other children) about it, the whole conversation lasting only five or ten minutes. He never saw her again except for a few minutes in April, 1940, at the courthouse in Spokane, where he had gone to appear as a witness in the guardianship proceeding. On that occasion, he told her who he was and asked how she was feeling. She replied that she was all right, and that ended the conversation. When asked whether, in his opinion, Mrs. Bottger comprehended the extent of her property, he first answered that no one over ninety

years of age is capable of transacting his business affairs. When the question was rephrased, he stated that he believed the testatrix was unable, on February 5, 1940, to remember where her property was located or to understand the effect of the provisions of a will. He admitted upon cross-examination, however, that he never discussed her property with her and never said anything to her about a will or any other legal document. He also said that she spoke English without lapsing into German and that he was able to understand her readily enough. He refused to express an opinion as to whether she could recall her children, saying that he never discussed her family with her.

The other witness, W. S. Brant, had known Ida Bottger for many years, as a result of his business dealings with her son Jesse. He saw her shortly after Jesse's death, when she came in to ask him to act as administrator of the latter's estate. He did not see her again until after he was appointed guardian of her estate in April, 1940, after which he saw her briefly every month when she came to his office for her allowance for living expenses. He testified that in his opinion she did not know, on February 5, 1940, what property she owned, could not understand the provisions of a will, and was incapable of comprehending the objects of her bounty. He added that she was old and childish and had relied entirely on Jesse during the latter's lifetime. On cross-examination, however, he admitted that she at all times remembered her children as objects of her bounty, and confessed that he had never asked her about the extent of her property. He further admitted that she always recognized him and had a good memory as far as ordinary matters were concerned. He said that she asked him to pay certain bills and took an interest in the sale of the personalty on the farm. Furthermore, he thought

her capable of handling fifty dollars a month, and from time to time paid that sum directly to her, accepting her receipt therefor.

We think that the testimony of these two witnesses, though disinterested and no doubt entirely sincere, was not entitled to the weight accorded to it by the trial court. Their opportunities for forming a sound opinion as to Mrs. Bottger's competency were extremely limited, and we believe that they were unconsciously influenced by an erroneous conception as to the degree of mental capacity necessary to the valid execution of a will. Judge Cooley has aptly expressed this danger in *Rice v. Rice,* 50 Mich. 448, 15 N. W. 545:

"No act can well be more simple than the gift of his property by an old man to the members of his immediate family; and it ought not to be considered, by court, or witness or juror, to be an act requiring strong mind or considerable capacity. The power to make such a gift becomes an important protection in that period of life when incapacity to labor and to conduct profitable enterprises has arrived, and it is important to see that it be not taken away by erroneous notions as to what is required for testamentary capacity. It is very evident, we think, that some of the witnesses in this case expressed opinions to the jury which had been formed by standards altogether incorrect and misleading; and the opinions themselves were consequently worthless."

To rebut the lay testimony as to incompetency, set forth above, the appellant called fourteen of Mrs. Bottger's friends and neighbors, all of whom testified that in their opinion she was at all times competent to make a will. It is true, as respondents have pointed out, that nine of these witnesses were friends of Harry and Charlotte Bottger or had participated in business dealings with them, but the fact remains that none of them has any financial interest in the outcome of this case, or

sustains any family relationship to any of the interested parties. The fourteen witnesses called by appellant all seem to have testified in a forthright manner and there is nothing in the record to indicate any bias affecting their credibility.

Appellant's witnesses, who had known Ida Bottger for periods of from one to forty years, testified generally that she was of average intelligence, that her memory was good, that she always remembered them, and that she took an interest in matters about the farm and in current affairs. They stated, further, that her conversation was as intelligent as that of other women in that community, that her speech was not disconnected, and that she never lapsed into German, except when joking with a certain witness who also spoke that language. They thought her cooking good and noticed no childishness, delusions, or other indications of mental deterioration. They all testified that in their opinion Mrs. Bottger was at all times able to understand the nature of a will, to comprehend the extent and location of her property, and to recall the natural objects of her bounty. Individually, these witnesses testified to specific conduct on Mrs. Bottger's part which tended to demonstrate that she possessed an alert and active mind and was fully competent to execute a will. They all seem to have thought highly of her, and the frequency and length of the visits made by some of them indicate that they enjoyed her company, which would hardly have been true had she been afflicted with senile dementia, as claimed by respondents.

We come now to the medical evidence relative to the mental capacity of the testatrix. Respondents introduced in evidence a copy of Mrs. Bottger's death certificate, which recites that she died of cardiac failure

due to mitral insufficiency and arteriosclerosis, with coronary sclerosis and hypertension, and that when she died she was suffering from a gangrenous condition in both feet. They also called two doctors who stated that in their opinion the decedent was mentally incompetent.

One of these witnesses had been the Bottger family physician for thirty-eight years. He testified, however, that he had not seen the testatrix much in recent years, and in fact could not recall when he last visited the farm prior to July 13, 1939. On that date he was called on account of Jesse's death and then talked to Mrs. Bottger, but did not examine her. He did not see her again until December 22, 1940, when he was called to attend her in her last illness. She recognized him and talked about her sickness and about things that had happened in the past. He did not make a thorough examination of her because of the dimness of the light, but he testified that he found she was suffering from a moderate hardening of the arteries. He gave her some liniment to be applied to her knee, on the assumption that the pain of which she complained was due to a recurrence of her rheumatism, although she was actually suffering from gangrene. He left after a brief stay, expecting to be called again in a few days. Instead, Mrs. Bottger had Charlotte call another doctor, now dead, who had her removed to a hospital where she remained until she died. The physician witness testified that the testatrix was childish and that her memory was poor, but told of nothing she said or did which would sustain either conclusion. When interrogated as to her capacity to make a will on February 5, 1940, he gave an indirect answer to the effect that, like any other person, she had lost touch with outside affairs, was less acute mentally than when

she was younger, and could not correctly comprehend business matters. Although he did not expressly say that she was incompetent, his testimony tends to that conclusion. But we agree with appellant that, although the witness is a physician, his testimony cannot be given added weight by calling it expert testimony as to decedent's mental condition. His only opportunities for observation were two visits on dates far removed from that on which the will was executed and under abnormal conditions, the first one having been made immediately after the death of Mrs. Bottger's favorite son, and the second shortly before her own death.

Respondents' other medical witness never saw Mrs. Bottger at all. In response to a long hypothetical question propounded by respondents' counsel, which on its face called for an answer favorable to respondents, he testified that she was incompetent. In cases of this kind, such evidence is of the weakest and most unsatisfactory sort. *In re Miller's Estate,* 10 Wn. (2d) 258, 116 P. (2d) 526. Moreover, the witness made it plain that his opinion was based on certain elements in the hypothetical question which cannot be regarded as having been established by the evidence. Thus, he stressed the decedent's lack of memory and lack of interest in her estate, neither of which was sufficiently demonstrated by respondents' other witnesses. He was also influenced by the fact that "somebody thought that she should have a guardian," but as we shall point out later, that circumstance was not necessarily proof of testamentary incapacity. The witness' greatest emphasis was upon the fact that Mrs. Bottger's death certificate indicated that she was suffering from arteriosclerosis at the time of her death, and his testimony makes it apparent that his conclusion was largely dependent upon the assumption that this condition had

reached an advanced stage. However, there is nothing in the death certificate showing to what extent arteriosclerosis contributed to Mrs. Bottger's death, or how important it was among the four named causes of cardiac failure. Furthermore, the family physician testified, as already pointed out, that, when he examined the testatrix on December 22, 1940, she had only moderate arteriosclerosis, and the testimony of one of appellant's medical witnesses, related below, indicates the same thing. We therefore believe that respondents' medical testimony is of very little value.

On the other hand, Dr. Austin J. O'Leary and Dr. Marjorie Heitman, the two medical witnesses called by appellant, actually examined Mrs. Bottger on February 5, 1940, and, having satisfied themselves as to her competency, signed her will as witnesses. Both of those witnesses had for years specialized in mental cases, and they examined the testatrix for over an hour, to determine whether she possessed the capacity requisite for the making of the will. The examination was suggested by Mr. Belknap at the time the will was prepared, because he felt convinced, from what had gone before, that a contest was to be expected. Appellant's two medical witnesses first made a brief physical examination of Mrs. Bottger, listening to her heart action, checking her pulse, taking her blood pressure, and finding that her radial arteries were not particularly hardened. They concentrated primarily, however, on the question of her mental capacity, testing her memory and her orientation, questioning her in order to determine whether she was subject to any delusions, and giving her a few problems in mathematics. They found her to be a woman of alert mind and average intelligence, who was in every way competent to make a will. She told them about her early

life and also satisfactorily answered questions as to recent events. She stated that she had inherited an estate of about seventeen thousand dollars from her son Jesse, and that she owned several farms in addition to farm equipment and ten thousand dollars in bank deposits. She spoke of having had nine children and said that she had lived with Jesse until his death. She named Herman, Bill, George, Belle, Hannah, and Harry as her surviving children and said she was then living with the latter. She also referred to some of her grandchildren, although no notation of their names was made by the medical witnesses. She stated further that making the will was her own idea and that she wanted to leave her property to Harry because he and Charlotte had been good to her, while the others had neglected her.

After completing the examination, the doctors called Mr. Belknap, who brought the will to Dr. O'Leary's office. The will was again read to Mrs. Bottger, and she said it represented her wishes, whereupon it was duly executed. Six weeks later, Dr. O'Leary examined Mrs. Bottger again, to check his original findings. He discovered no change and remained fully satisfied that she was competent to make a will.

The testimony of Dr. O'Leary and Dr. Heitman is entitled to great weight, since they were, at the same time, attending physicians and subscribing witnesses. *Points v. Nier*, 91 Wash. 20, 157 Pac. 44, Ann. Cas. 1918A, 1046; *In re Miller's Estate, supra.*

In this connection, respondents contend that the fact that physicians were called to examine the testatrix indicates that the parties concerned were suspicious of her testamentary capacity. However, we think this was a wise course to pursue, in view of the age of the testatrix, the nature of the will, and the fact that there

was reason to believe that guardianship proceedings would be instituted in the near future, and possibly a will contest later.

In connection with respondents' lay and medical testimony touching the subject of Mrs. Bottger's mental capacity, the trial court seems to have accorded considerable weight to the result in the guardianship proceeding, as indicating that she was incompetent to make a will on February 5, 1940. But we are of the opinion that the fact that a guardian has been appointed to conserve the estate of one adjudged incompetent to manage it herself does not necessarily tend to establish lack of capacity on the ward's part to execute a will (whether the adjudication of incompetency precedes or follows the execution of the will), unless the order appointing the guardian is based upon an express finding of some mental defect inconsistent with the possession of the capacity required for the execution of a will. The appointment of such a guardian is not an adjudication that the ward is insane (*In re Miller's Estate, supra*), nor does it in all cases imply that the ward is not fully capable of making a valid testamentary disposition of his property. Atkinson Wills (1937) 194, § 83; 1 Page, Wills (Lifetime ed. 1941) 264, § 131; 68 C. J. 437, Wills, § 32; 28 R. C. L. 100, Wills, § 51; note (1920) 8 A. L. R. 1375. A person may indeed be incapable of managing and conserving a large estate and yet be perfectly able to understand the nature of a will, to comprehend the extent of his property, and to recall the natural objects of his bounty. In short, he may require a guardian to supervise his estate and yet be competent to make a valid will disposing of it upon his death.

In this instance, the order appointing the guardian was in no sense an adjudication that Ida Bottger was

mentally incompetent to handle her own affairs. It expressly recited that she herself had consented to the appointment, and in addition stated merely that she was ninety-two years old, could not read or write English, and had never had any business experience. There was nothing in that order upon which to found a presumption of lack of mental capacity of any sort, and this conclusion is reinforced by a reading of the transcript of the hearing in the guardianship proceeding, which makes it clear that there was no contention made by anyone as to any impairment of Mrs. Bottger's mind.

In view of the weight to be ascribed to the physicians' testimony and of the rules as to presumptions and burden of proof, set forth above, we are convinced not only that respondents have failed to sustain the burden of proving incompetency by clear, cogent, and convincing evidence, but that, on the contrary, the evidence establishes by a clear preponderance that Ida Bottger was competent to make the will executed by her on February 5, 1940.

The respondents' second ground of attack upon the will was that it was executed as the result of undue influence exerted upon the testatrix by Harry Bottger and Charlotte Bottger, his wife. In their amended petition contesting the will, respondents alleged that Harry and Charlotte, by blandishments and promises, obtained controlling influence over the testatrix, at a time when she was weakened in body and mind, and were thereby enabled to dictate to her what she should do with respect to her property. They further charged that Harry and Charlotte, by entreaty, undue persuasion, blandishment, promises, threats, and untrue and improper statements poisoning Mrs. Bottger's mind against her other heirs, prevailed upon her to such an

extent that against her true wishes she executed, in form but really at their dictation, the will here in question, which she never would have done had it not been for the domination and control exercised by Harry and his wife.

By a bill of particulars subsequently filed in the cause, the respondents alleged (1) that Harry and Charlotte promised Ida Bottger that they would protect her from being deprived of her home and property by the respondents; (2) that they threatened that unless Mrs. Bottger turned over all her property to them, she would be left alone and probably be put into an insane asylum by the respondents; and (3) that they improperly stated that certain of respondents were thieves and not to be trusted, and that all of the respondents were filing proceedings for the purpose of confining her in an insane asylum or other institution.

It will be noted that these allegations include charges of both undue influence and fraud. While some of our decisions have referred to both these elements as though they were merely different aspects of the same thing, and while, of course, they are closely related, there is nevertheless a distinction between them which we think should be recognized.

It is the universal rule that a will procured by undue influence is invalid, but the courts have always recognized that a will cannot be overthrown upon this ground unless the influence complained of was, in fact, *undue* influence. Our decisions clearly hold that influence may be exerted upon a testator in the form of advice, persuasion, or even importunity, directed to the end of affecting the testamentary disposition of his property, without in any way invalidating the will induced by these means. *Converse v. Mix*, 63 Wash. 318, 115 Pac. 305; *In re Patterson's Estate*, 68 Wash. 377, 123

Pac. 515; *In re Larsen's Estate, supra.* This was recognized in *Roe v. Duty,* 115 Wash. 313, 197 Pac. 47, where we said:

"To vitiate a will there must be more than influence. It must be undue influence. It was not undue influence for the son to persuade or solicit his mother to award him the greater part of the estate rather than to award it to the daughter. Influence becomes undue only when it overcomes the will of the testator or the testatrix, when the act of making the will is the result of such coercion that free agency is destroyed. The disposition of the property may be changed by the influence exercised, but so long as the mind of the testator or testatrix is not overborne by the mind of another, it does not amount to undue influence."

This statement has been expressly approved in subsequent cases: *In re Seattle's Estate,* 138 Wash. 656, 244 Pac. 946; *In re Riley's Estate,* 163 Wash. 119, 300 Pac. 159.

In other cases it has been held that, in order to vitiate a will on this ground, an influence must be shown which, at the time of the testamentary act, controlled the volition of the testator, interfered with his free will, and prevented an exercise of his judgment and choice. *In re Larsen's Estate, supra; Dean v. Jordan, supra; In re Schafer's Estate, supra; In re Miller's Estate, supra.*

In the case of *In re Adams' Estate,* 120 Wash. 189, 206 Pac. 947, we said that the undue influence which will operate to avoid a will must be an influence tantamount to force or fear which destroys the testator's free agency and constrains him to do what is against his will. Compare, also, the statements in the following cases relative to the meaning of "undue influence": *In re Patterson's Estate, supra; In re Tresidder's Estate,* 70 Wash. 15, 125 Pac. 1034; *Barbee v. Barbee,* 134 Wash. 418, 235 Pac. 945.

The essence of all these various formulae is that in order to constitute ground for invalidating a will, the influence allegedly exerted over the testator must have been such as to override his will power and substitute the will of the person exercising the influence. In other words, the person accused of dominating the testator must have imposed his wishes upon the latter, not by persuasion directed to his intellect or by appeal to sentiment, but by coercion of his mind by threats, force, or unbearable insistence, so that the testament, though in form that of the testator, is in fact that of another who has established ascendency over the mind of the former.

On the other hand, a will can also be invalidated, either in whole or in part, on the ground of fraud, whether it be fraud in the execution or fraud in the inducement. In this case, there is no claim of fraud in the execution of the will, so we are concerned only with the doctrine that a will can be avoided for fraud in its inducement.

In the case where a will is attacked because allegedly induced by fraud, it may be avoided, not because the testator's mind was coerced, but because his mind was deceived. The will is actually the free and voluntary act of the testator and expresses his wishes at the time, but it is subject to attack on the ground that his disposition of his estate was based upon false data as the result of fraudulent representations made by, or on behalf of, the person or persons benefiting from his will as made. There is thus a real distinction between fraud and undue influence. Atkinson, Wills (1937) 218, § 97; 68 C. J. 740, Wills, § 433; note (1934) 28 A. L. R. 787, 792. In 1 Page, Wills (Lifetime ed. 1941) 353, § 179, this type of fraud is defined as follows:

"Fraud in the inducement consists of wilfully false statements of fact other than those relating to the

nature of contents of the instrument, made by a beneficiary under the will which is thus induced, which are intended to deceive testator, which do deceive him, which induce him to make a will, and without which he would not have made such will."

Expressed otherwise, the representations must be with reference to extrinsic facts, and must be made to the testator by, or on behalf of, a person benefiting under the will; the statements must be false and must be known to be so by the person making them (although in some circumstances mere suppression of the facts may be sufficient to constitute fraud); and the facts misrepresented must be material and must induce the making of the will in question. See Atkinson, Wills (1937) 221, § 99.

Upon a study of the record in this case, we are convinced that there was no undue influence exerted upon Ida Bottger at the time of the execution of her will. The evidence shows by a clear preponderance that she not only possessed the degree of mental capacity required for a valid will, but, over and above this essential requirement, she had a vigorous mind and a positive disposition. She was, in fact, not a person who could easily be subjected to influence of the sort necessary to invalidate a will. Mr. Belknap, Dr. O'Leary, and Dr. Heitman testified that they and Mrs. Bottger were alone in the room when the will was executed. Harry and Charlotte were in the outer office, but merely because Mrs. Bottger was unable to get about without assistance, due to her age. The testatrix told Dr. O'Leary that making the will was her own idea and told Mr. Belknap that neither Harry nor Charlotte had done anything to persuade her to dispose of her property in this way, or to make a will at all. All three of the people present when she signed the will testified that, after the will was read, Mrs.

Bottger said that it represented her true wishes. They also stated that the testatrix acted voluntarily in signing the will, that nothing was done or said to influence her or to interfere with her free agency, and that, in fact, she was quite determined to make the will and wanted to be certain that it would withstand any possible attack.

The record further discloses that Mr. Belknap and Mr. Bilke, a neighbor of the testatrix, both advised her against leaving all her property to Harry, but she persisted in carrying out her original intention in that respect. Her son Charles had advised her some time previously to make a will, and so had Mr. Belknap, but there is no evidence that Harry or his wife ever attempted to persuade her to do so.

As the trial judge observed in his memorandum opinion, there was no direct evidence in this case of any undue influence whatsoever. It is true, of course, that in the very nature of things a charge of undue influence can rarely be proved by direct evidence and must be established, if at all, by circumstantial evidence. *Roe v. Duty, supra; Foster v. Brady,* 198 Wash. 13, 86 P. (2d) 760; *In re Schafer's Estate, supra.* Mere suspicion of undue influence is not enough (*In re Patterson's Estate, supra; In re Bradley's Estate,* 187 Wash. 221, 59 P. (2d) 1129; *In re Schafer's Estate, supra*), although we have recognized that in a particular case the facts may be of such a suspicious nature as to raise a presumption of fraud or undue influence, and that unless this presumption is met by evidence to the contrary, it may suffice to overthrow the will. *Dean v. Jordan, supra; Foster v. Brady, supra; In re Schafer's Estate, supra.* We are not convinced that, by the standards established in those cases, a presumption of fraud or undue influence arose

here, but even if it be assumed that it did and that as a consequence the burden of going forward with the evidence shifted to appellant, we are still convinced that the evidence to the contrary is not only sufficient to rebut the presumption, but actually goes further and by a preponderance establishes the absence of fraud or undue influence.

Some further consideration should perhaps be given to the specific matter of fraud as an alleged inducement to the execution of this will. We have already expressed our conviction that Ida Bottger's mind was not overcome nor her volition impaired at the time she executed her will. It remains to be determined whether she was induced to make that will by fraudulent misrepresentations as to any pertinent extrinsic fact. Since such misrepresentations, in order to invalidate a will, must be such as would actually result in inducing the testamentary instrument, we shall consider primarily the reasons which Mrs. Bottger, in conversations with Dr. O'Leary, Dr. Heitman, Mr. Belknap, and Mr. and Mrs. Bilke, assigned for her action.

Her principal reason for leaving all her property to Harry seems to have been that he and Charlotte were good to her, while her other children and her grandchildren neglected and quarreled with her. These are all facts clearly established by the record in this proceeding, and of course Mrs. Bottger was aware of them without being told. There is no evidence that Harry or Charlotte ever made any effort to prevent the others from seeing the testatrix, and Mr. Belknap actually tried to persuade Herman and Bill to visit their mother. There can be no doubt but that Mrs. Bottger was deeply hurt by the attitude of respondents.

In the second place, the testatrix was incensed by

the fact that some of the children were planning to institute proceedings for the appointment of a guardian of her estate or person. On the day that the administrators of Jesse's estate were appointed, Charles Bottger told his mother, in the presence of appellant and Mr. Bilke, that Bill and Belle were talking of having such a guardian appointed. When Bill quarreled with his mother, he threatened to get a court order to compel her to desist making charges to the effect that he had stolen certain bonds or moneys from Jesse, and when he learned from Mr. Belknap of the deeds to Harry, he intimated that he would take legal action to prevent anything more of that kind, which conversation was later related to the testatrix. There is nothing to indicate that Harry or Charlotte ever told Mrs. Bottger anything about a contemplated guardianship, but even if they had done so, their statement would have been true, and therefore not fraudulent.

A guardianship proceeding was subsequently instituted, as related above, and Mrs. Bottger felt very bitter about it. While it is true that Harry finally acquiesced in the guardianship, it is evident that he did so upon his mother's insistence that she could not endure a court hearing. The record reveals that, at the time of making her will, Mrs. Bottger intended to make gifts of money to Herman and Hannah when she gained control of Jesse's estate, but only if they did not join the others in urging the guardianship. Both of them signed the petition for the appointment of a guardian, however, and as a result she wished to exclude them from her estate along with the others.

The third reason assigned for making her will as she did was that Bill and the others had desired to move her out of her home and divide her property among the children, while Harry wished to permit

her to stay there. This was probably suggested at a time when they all thought that they were going to share in Jesse's estate, but it rankled in the mind of the testatrix nevertheless. Mrs. Bilke testified that Mrs. Bottger had said that Bill wanted her to make her home with Belle so he could put George on the farm, and both Bill and Herman admitted, in their testimony, that this plan was discussed at that time. Again, there is nothing to show that Harry or Charlotte ever mentioned this matter to Mrs. Bottger, even though their representation in that respect would not have been fraudulent.

.The trial judge seemingly arrived at his finding of undue influence because of his impression that Harry and Charlotte deliberately set about trying to get control of Mrs. Bottger's property. He was evidently influenced by the belief that Harry had not been attentive to his mother before Jesse's death, and that his kindness thereafter should consequently be regarded with suspicion. We do not think that any of the evidence leads to that conclusion, and there was emphatic evidence to the contrary. The trial court also seemed to entertain some suspicion of Charlotte's conduct in moving in with Mrs. Bottger immediately after Jesse's death, but it should be remembered that she took that step before it was realized that the testatrix was Jesse's sole heir. Furthermore, Charlotte testified that Mrs. Bottger invited her to come to live with her, and the record tends to make this appear entirely probable.

The trial judge also stressed what he regarded as Harry's eagerness to assume control of his mother's business affairs, but again it should be recalled that he did this only in his capacity as administrator of Jesse's estate, having been nominated as such by his

mother in the presence of most of the other children. The judge also stated in his memorandum opinion that Harry circulated a story to the effect that his brother Bill had taken certain bonds belonging to Jesse when they dissolved partnership, but the record discloses that Mrs. Bottger knew all about this alleged misappropriation long before, she and Jesse having discussed it with Mr. Bilke in 1937. As we read the record, there is nothing to indicate that Harry or Charlotte was in any way to blame for the fact that Mrs. Bottger quarreled with Bill on that score.

The trial court also was of the belief that Charlotte had insinuated that George had stolen a brooder belonging to a Mrs. Bond, one of appellant's witnesses. The evidence discloses that when Mrs. Bond came to the farm to inquire about the brooder, which George had borrowed from Mr. Bond, Charlotte showed her the only brooder on the place. It was actually the one which had been borrowed, but Mrs. Bond did not recognize it because of certain repairs which had been made. Charlotte then merely told Mrs. Bond where George was staying and said that he might have taken it with him when he left. There is no evidence that Mrs. Bottger ever knew of this incident, and she did not mention it as one of the factors inducing her will.

In cases of this sort, the suspicion of fraud is sometimes difficult to overcome entirely. We are convinced, however, that respondents have failed to sustain the burden of proof on this issue, as they were required to do, and that appellant more than met any presumption of fraud or undue influence which may have arisen because she and Harry had the opportunity of influencing the testatrix and because the latter actually left the bulk of her estate to Harry.

We believe that Ida Bottger actually wished to dis-

pose of her property exactly as provided in her will and that her reasons for doing so were not the result of fraudulent misrepresentations. It is not our function to assess the soundness of those reasons, for the law permits one to dispose of his property by will in any lawful manner he may wish, and it would be without precedent or reason to hold that a will may be invalidated simply because it is unusual or even unjust. *In re Patterson's Estate, supra.* On all the facts in this case, we conclude that Ida Bottger executed her will freely and voluntarily, and not through fraud or undue influence.

In view of our decision that the will must be sustained, it becomes unnecessary to discuss the validity of the deeds referred to above. They are, in our opinion, entirely valid for reasons given in sustaining the will, and in any event it would be without purpose to set them aside, since the property conveyed thereby would nevertheless pass to appellant by virtue of her being the sole heir of Harry Bottger, the residuary legatee and devisee under Mrs. Bottger's will.

The judgment is reversed, with direction to dismiss the contest proceeding.

ROBINSON, C. J., SIMPSON, and DRIVER, JJ., concur.