[No. 69-40690-3.    Division Three.    February 25, 1970.]

*In the Matter of the Estate of* GUY E. MOULTON, *Deceased.* NATIONAL BANK OF COMMERCE OF SEATTLE, *Appellant,* v. PEARL MERCER *et al., Respondents.*

*Engst, Phelps & Young* and *Edward T. Engst,* for appellant.

*Kimball & Clark,* for respondent Mercer.

*Frederick M. Crollard, Jr.,* for respondents United Protestant Church of Mansfield et al.

GREEN, J.—This is a will contest. After extensive hearings, the trial court entered findings of fact, conclusions of law and an order revoking the probate of the will of Guy E. Moulton, deceased, dated May 27, 1963, and canceling letters testamentary issued to the National Bank of Commerce of Seattle as executor. The executor appeals.

Guy E. Moulton died at the age of 82 years in a nursing home in Yakima on July 11, 1966. He left an estate appraised at $81,152.96 in Douglas County, where he lived most of his life. Earle Jenkin, the executor named in his 1963 will, declined to serve, and the National Bank of Com-

merce as alternate executor filed the will on August 8, 1966. It was admitted to probate on August 11, 1966, and letters testamentary issued. The sole named heirs were Cecil and Gladys Glessner, the former being decedent's nephew.

Two petitions were filed contesting the validity of this will. A petition by the United Protestant Church of Mansfield as beneficiary under a will dated February 5, 1962 alleged decedent's lack of testamentary capacity on May 27, 1963. Pearl Mercer, decedent's niece and a beneficiary under a will dated March 17, 1959, petitioned also alleging lack of testamentary capacity and in addition that decedent was acting while under undue influence or duress when he signed the May 27, 1963 will.

It is conceded by all parties that decedent was a widower without surviving descendants. However, there were many living nieces and nephews of himself and his deceased wife, Nancy.

Upon trial, the issues were limited to the validity of the 1963 will. All assignments of error raised by the executor on this appeal are directed to the findings and conclusions of law entered or refused by the trial court on the issues of: (1) undue influence; and (2) lack of testamentary capacity. The trial court made no conclusion with respect to undue influence; the decision rests solely on the ground that decedent lacked testamentary capacity to execute the will. This opinion will be directed to this issue.

■ The rule as to what constitutes testamentary capacity was stated in *In re Estate of Bottger,* 14 Wn.2d 676, 129 P.2d 518 (1942) at 685:

> [A] person is possessed of testamentary capacity if at the time he assumes to execute a will he has sufficient mind and memory to understand the transaction in which he is then engaged, to comprehend generally the nature and extent of the property which constitutes his estate and of which he is contemplating disposition, and to recollect the objects of his bounty. This is the standard by which courts must measure the facts of each case in which it is contended that an instrument offered or accepted as the will of a decedent was executed at a time when the

testator lacked capacity to make a valid testamentary disposition of his property.

The burden of proof on the issue of testamentary capacity rests upon the party contesting probate of the will. RCW 11.24.030. To set aside a will, it is necessary the evidence be clear, cogent and convincing. *In re Estate of Torstensen,* 28 Wn.2d 837, 184 P.2d 255 (1947); *In re Estate of Klein,* 28 Wn.2d 456, 183 P.2d 518 (1947).

On February 26, 1963, decedent was admitted as a patient to the Okanogan-Douglas County Hospital in Brewster, Washington. Records of the hospital show a diagnosis of "Senility due to arteriosclerotic disease." On March 1, 1963, he was moved to a nursing home adjacent to the hospital where he remained until May 14, 1963. At that time, he went to live with Cecil and Gladys Glessner.

On April 2, 1963, R. A. Hensel, decedent's attorney, prepared and decedent executed a general power of attorney in favor of Cecil Glessner. Sometime prior to May 23, 1963 and possibly as early as April 10, 1963, decedent asked Mr. Hensel to change his 1962 will. Mr. Hensel prepared a draft of a new will in May 1963 that would have left $100 to the Mansfield Cemetery Association and the balance of his estate to Mr. and Mrs. Glessner. Because Mr. Hensel did not "feel that . . . Mr. Moulton was capable of making a will", this will was not executed. Mr. Hensel requested that before decedent execute the will he be examined by his doctors at Brewster.

An appointment was made with Drs. Lamberton (decedent's family doctor), Stout, and Schnibbe at their clinic in Brewster for an examination to determine if decedent possessed testamentary capacity. Mr. Hensel informed the doctors of the legal criteria for determining such competency. Cecil and Gladys Glessner went with decedent and Mr. Hensel to the clinic. Following examination, the doctors reported to the Glessners and Mr. Hensel their opinion that decedent was not competent to make a will.

Thereafter, on May 27, 1963, the Glessners took decedent to Lyle B. Higgins, a lawyer in Chelan who was attorney

for Glessners' daughter. Mr. Higgins interrogated decedent in the presence of Mr. Glessner and thereupon prepared the will in question. It was executed by decedent in the presence of Mr. Higgins and his secretary and provided that all of the estate would be left to Mr. and Mrs. Glessner. Mr. Higgins was not informed of all events preceding the visit to his office.

On July 3, 1963, Mrs. Glessner wrote a letter to Mr. Hensel inquiring about the procedure necessary to place decedent under guardianship, naming Cecil as guardian. Mr. Hensel was not informed of the visit to Mr. Higgins. On July 8, 1963, Cecil Glessner signed a petition to be appointed guardian and he was so appointed on July 18, 1963. Mr. Hensel was attorney for the guardian. The petition for guardian stated that decedent was "unable to handle his own affairs." In August 1963, decedent was taken to a Yakima nursing home where he remained until his death.

Contestants presented testimony by numerous nieces and nephews of decedent and his wife, Nancy, together with Nancy's then 81-year-old sister. Their testimony showed that following the death of Nancy in 1959 decedent's physical and mental condition deteriorated at an accelerating rate. By 1963 his personal hygiene and cleanliness was very bad. His home was described as filthy with spoiled food on the table and in the refrigerator, with mice who partook of the open food and on one occasion nested in one of the pillows on decedent's bed. Decedent became incontinent and the toilet facility was very filthy. His memory degenerated to the point that he did not recognize relatives who had seen him on a regular basis and ministered to his needs.

On the other hand, the proponents of the will consisting of Cecil Glessner and his family, together with the tenants who farmed decedent's wheat land, presented a very different picture. They described him as about like any lonely, elderly man who, after the loss of his wife, had to live alone. It was claimed his memory was good; he made visits to check on the crops and was interested in how his tenant

was farming his land. It was also stated that he was present and participated in events such as family dinners at the home of Cecil Glessner and the tenant.

These opposite viewpoints were projected by those having some interest in the outcome of the proceeding. Cecil and Gladys Glessner as beneficiaries would benefit if the will were sustained. The interest of the Glessner children who testified is apparent. On the other hand, if the will were held invalid and the estate went by intestacy or under the 1959 will, the other nieces and nephews who testified would benefit.

The disinterested witnesses called by contestants were attorney R. A. Hensel, nurse Faybelle Stranne, Dr. Harold Stout, and Dr. Harold W. Lamberton. The disinterested witnesses called by the proponents were Earle Jenkin, a Waterville banker, and Lyle Higgins, a Chelan lawyer, together with his secretary. It is only in the background of their testimony that the testimony of interested witnesses can be placed in perspective and evaluated.

Mr. Hensel, who prepared decedent's income tax returns for prior years and his will in February 1962, saw decedent again in February 1963. At that time, he noted decedent's mental capacity had degenerated considerably. He saw the decedent several times subsequent to February 1963 and testified decedent, both physically and mentally, was continuing downhill at a progressively faster rate; that his memory was very poor; that decedent would lose track of time and wouldn't remember whether he had seen Mr. Hensel a day or two ago or two weeks ago; after he recalled the event, his memory would be only in generalities and not specific, and it was necessary to remind him of what was going on. Because of these facts, when decedent asked Mr. Hensel to change his 1962 will Mr. Hensel requested an examination by decedent's doctors to determine his competency to make a will. In July 1963, about the time the guardianship was being established, Mr. Hensel confirmed again that decedent's deterioration was continuing.

Faybelle Stranne, a nurse employed at the Brewster nurs-

ing home, testified concerning her observations of decedent when he was in the nursing home between March 1, 1963 and May 14, 1963. Mrs. Stranne had been an LPN for 30 years. She described decedent as " . . . you may even go beyond saying he was senile. He was incompetent." She later testified that he was not of sound mine and was resistive, belligerent, and incontinent. She defined "incontinent" as unable to control his bodily functions such as bowel movements. "It wasn't because he couldn't help it, I think it was because he just didn't know enough to go to the bathroom." This was so even when they told him where to go. Dr. Lamberton gave like testimony. Nurse Stranne cited numerous specific instances within her knowledge demonstrating the basis for her opinion that decedent was mentally unsound. On one occasion, he insisted he could tell time from a watch with its hands broken off. On another occasion, he wanted to leave the nursing home to get his bank statements. Nurse Stranne handed him an ad for a hearing aid telling him it was his bank statement. He picked it up, looked at it and said, "See, I got plenty of money", and put it on his bedstand and kept it as his bank statement.

Drs. Stout and Lamberton testified that, together with their partner in practice, Dr. Schnibbe, they conducted an extensive consultation with decedent on May 23, 1963. Dr. Stout had consulted with many patients suffering from senility and served on sanity commissions. Dr. Lamberton began treating decedent in 1962 and had known him since 1956 when he was treating his wife. On February 26, 1963, while decedent was in the hospital, Dr. Lamberton diagnosed decedent's ailments as heart trouble and generalized arteriosclerosis that affected his brain. Both doctors acknowledged that Mr. Hensel advised them of the guidelines for determining decedent's competency, including the extent of his assets, the objects of his bounty or relatives, and the nature of the transaction. Based upon the examination, it was their opinion that decedent was not competent to make a will on May 23, 1963, nor was it likely that he

would have been competent to make a will 4 days later on May 27, 1963.

The testimony of the doctors that decedent was suffering from senility and was mentally incompetent to make a will was corroborated by a memorandum prepared immediately after the examination. Some of the pertinent facts disclosed in the interview and noted in the memorandum were that decedent first stated he did not have any property other than the farm but with prompting remembered he had two rental houses; he first said he was farming the ranch, but after prompting finally agreed a tenant was farming it; he denied any knowledge of his ownership in mutual funds, stocks or investments; he could not remember the names of relatives; he could not remember whether his brothers were living or dead and didn't know anything about his sisters.

Earle Jenkin, manager of the Waterville Branch of the National Bank of Commerce, testified on behalf of the proponents on the issue of competency. He knew decedent from the beginning of the early 1940's as a customer of the bank. At times decedent would telephone or stop at the bank to inquire about his checkbook balance. He would assist in balancing decedent's checkbook record. He inquired more often and had progressively less understanding of what his balance was from time to time. Except for that, Mr. Jenkin did not notice any particular change in the decedent except that with advancing age he was slowing down somewhat. After the power of attorney was signed on April 10, 1963, his encounters with decedent were infrequent and brief. Mr. Jenkin testified that decedent expressed a desire to change his will after February 1962 to name the Glessners as beneficiaries. He told decedent to see Mr. Hensel.

Lyle Higgins, a lawyer in Chelan, testified to an appointment with the decedent who was accompanied by Mr. and Mrs. Glessner. This was the first time that Mr. Higgins ever met decedent or Mr. and Mrs. Cecil Glessner. Decedent appeared to be coherent and rational. He wanted a will

prepared leaving his estate to the Glessners. After a preliminary conversation in which he learned decedent had no wife or children, a first draft of a will was prepared. A second draft of the will was prepared to correct the spelling of the executor's name by adding an "e" to "Earl." The will as corrected named "Earle Jinkins" executor. (This spelling was still incorrect. The name should have been "Earle Jenkin", as correctly spelled in the 1962 will.) Mr. Higgins testified at the time the will was executed he thought the decedent competent. However, he also testified:

> If I had been informed that the doctors had determined, in their judgment, that he was not competent, I would not have had him execute a will.

Even though Mr. Glessner and decedent knew the opinion of the doctors, they at no time advised Mr. Higgins of that opinion. The opportunity to disclose it existed at all times.

Mr. Higgins' secretary, a witness to the will, testified expressing her view that decedent appeared competent to make the will. However, it is evident from her testimony that she was not present during any of the conversations and her participation was limited to typing the will and witnessing the signatures.

No medical testimony was presented on behalf of the proponents. While the lay testimony for both sides was conflicting, it is apparent from the record that the testimony of Mr. Hensel, nurse Stranne and Drs. Lamberton and Stout, together with their memorandum, tends to corroborate the lay testimony of the contestants. The trial court had the opportunity to see and hear the witnesses and judge the weight and credibility of their testimony. It gave great credence to the testimony of the doctors, Mr. Hensel and nurse Stranne. Our reading of the entire record convinces us the evidence does not preponderate against the finding of lack of testamentary capacity by the trial judge. *In re Estate of Gordon*, 52 Wn.2d 470, 326 P.2d 340 (1958).

While this case was pending on appeal in the Supreme Court, contestants filed a motion to dismiss upon the ground the executor could not be an aggrieved party. Fol-

lowing the filing of briefs and oral argument, the Supreme Court entered a notation order denying the motion. No opinion was issued with respect to this ruling. Petitioners, while arguing the appeal on the merits, again contended their motion to dismiss should have been granted. In view of the Supreme Court's previous ruling, this court denies the motion.

Judgment affirmed.

EVANS, C. J., and MUNSON, J., concur.