IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | |
|---|---|
| In re Estate of: ) | |
| ) | No. 30995-9-III |
| ) | |
| THEODORE ROOSEVELT ALSUP, ) | |
| ) | PUBLISHED OPINION |
| ) | |
| Deceased. ) | |

SIDDOWAY, C.J. — Theodore Roosevelt Alsup was subject to a guardianship during the last 14 years of his life, during which he executed a will and later married. After he died, the validity of the will and the marriage were contested by the personal representative on the basis of his incapacity, resulting in disputes between a possibly pretermitted wife, beneficiaries named in a possibly invalid will, and persons who would be heirs if Mr. Alsup had died intestate. The trial court concluded that both the will and the marriage were void. Nicola Warren, who married Mr. Alsup in 2002, appeals.

The trial court erred. Findings of incapacity supporting appointment of a guardian do not compel a conclusion that an individual lacks testamentary capacity. And the challenge to Mr. Alsup's marriage after his death came too late where the fact of his marriage was well known and no one chose to challenge its validity during his lifetime.

We reverse the trial court's orders holding the will and marriage invalid and direct the trial court to enter judgment that Ms. Warren has the rights of a surviving spouse. We remand the issue of the validity of the will to the trial court to determine, as a matter of fact, whether Mr. Alsup had testamentary capacity at the time he executed the 2001 will.

## FACTS AND PROCEDURAL BACKGROUND

According to Nicola Warren, she and Theodore Roosevelt Alsup met in January 1980, when they were ages 32 and 33, respectively. They began dating shortly thereafter. Mr. Alsup lived with Ms. Warren at her home in Moses Lake for approximately 1 year in the early 1980s. He moved from Ms. Warren's residence after he gained custody of his son but Ms. Warren maintains that their dating relationship continued for the next 16 years.

During most of the years they were dating Mr. Alsup was teaching math and social studies at the Columbia Basin Job Corp, according to Ms. Warren. He taught there until he was deemed disabled in 1995, reportedly suffering from posttraumatic stress disorder and exposure to Agent Orange traceable to his military service. Ms. Warren reports that he remained independent until 1996 and 1997, when he suffered a series of illnesses including a stroke, diabetes, and hypertension.

In July 1997, Gerald Alsup, Mr. Alsup's brother, and Jessie Shannon, whose relationship to Mr. Alsup is not clear, petitioned the Grant County Superior Court for appointment as guardians for Mr. Alsup. The court appointed them as full coguardians of Mr. Alsup's person and estate. The order characterized the "capacities, conditions and

2

needs" of Mr. Alsup as "requir[ing] 24-hour a day care [sic] nursing care in a nursing

facility and . . . a guardian to supervise his nursing care, to give consents to medical

providers; . . . and to handle his financial affairs." Clerk's Papers (CP) at 39.

The court assigned the guardians authority "for investment and expenditure of the

ward's estate," as follows:

1. To manage in all respects the property and income of the incompetent;
2. To pay on incompetent's behalf, from incompetent's assets and income, any legitimate obligations incurred by or on behalf of the ward;
3. To receive on the ward's behalf any and all sums whether from Veterans' disability, Social Security, Medicare, Medicaid, or other sources, and to pay any such sums received on ward's behalf for ward's nursing, medical, health and welfare needs.
4. To reimburse co-guardians from the Ward's funds any legitimate expenses incurred by them in fulfilling their duties as guardians.

CP at 39-40. Elsewhere, the order provided:

> ORDERED that the co-guardians are authorized to perform such acts and actions on behalf of said ward as they deem necessary, reasonable, prudent and in accordance with the powers awarded to them herein except as provided to the contrary in RCW 11.92.040.

CP at 40. The order did not mention any restraint on Mr. Alsup's right to marry or

execute a will.

Several changes were made in the guardianship between 1997 and February 2001:

the initial coguardians withdrew; Jerry Thompson was appointed as a successor guardian;

Mr. Thompson then applied for an order allowing him to withdraw; and Mr. Alsup

3

appeared in the guardianship proceeding through his lawyer, Harry Ries, asking that he be allowed to participate in the decision appointing a successor guardian and that the form of his guardianship be modified. The court appointed Bruce Pinkerton as guardian ad litem to investigate Mr. Alsup's needs and report and make recommendations to the court.

On January 2, 2001, while the issue of a successor guardian and modification were being raised but while Mr. Alsup was still subject to the full guardianship, he executed a will. The will appears to have been prepared by Mr. Ries. It was self-proved by the affidavit of the two witnesses, Carol J. Ries and Laura R. Larson, as permitted by RCW 11.20.020(2). The affidavit appended to the will stated, among other matters, that "at the time of the signing of the Will, said Testator appeared to be of sound mind and understood the nature of the acts being performed." CP at 27. The will named Catherine McKinzy—whom Mr. Pinkerton either had already recommended or soon would recommend be appointed as successor guardian—as personal representative. It named both her and Dorsey Gene McKinzy, Mr. Alsup's nephew and his former caregiver, as substantial beneficiaries of his estate. Other assets and shares of the estate were left to Mr. Alsup's brother, Tim Alsup; to Dennis Value, who was identified in submissions to the court as a friend of Mr. Alsup's; and to Vick Burnet, whose relationship to Mr. Alsup is not identified in the record.

In February 2001, the trial court entered an order appointing Ms. McKinzy as successor guardian of Mr. Alsup's person and estate and at the same time modified the

4

guardianship, giving Ms. McKinzy the authority of only a limited guardian. The court

assigned nine categories of authority to the limited guardian and separately identified

only three limitations placed on Mr. Alsup, those being:

> a.      the Ward shall not have the authority to enter into any contract,
> make any gift having a total value in excess of $100.00 or sell any real or
> personal property.
> b.      the Ward shall not have the authority to remove funds from any
> existing banking institution account or brokerage account without the
> written consent of the Limited Guardian, provided, however, that upon
> request of the Ward, the Ward shall be allowed to examine any and all
> records of any such account.
> c.      the Ward shall have the authority to maintain a checking account and
> savings account, provided, however, the Ward shall not have the authority
> to have on deposit in any savings account an amount in excess of $500.00
> at any given time.

CP at 170.

A year and a half later, in September 2002, Mr. Alsup married Ms. Warren. They

had by then known each other for 22 years. Following the marriage, Mr. Alsup continued

to live at a care facility and Ms. Warren continued to live in her home.

In October 2002, Ms. McKinzy withdrew as Mr. Alsup's guardian. Another

petition was thereupon filed with the Grant County Superior Court to appoint a

replacement guardian and Mr. Pinkerton was again appointed as the guardian ad litem.

Mr. Pinkerton filed a report with the court in December. His report addressed the

fact that three nonprofessional guardians had asked to be relieved of their duties, with one

of the contributing factors being that "although Theodore Alsup may be able to

cognitively process and analyze issues, information, and decision-making issues, he is clearly unable to handle his own affairs due to his inability to communicate and his physical health." CP at 204. He reported that "[t]here continues to be a lack of acceptance by Theodore Alsup that he needs a Guardianship and therefore, he continually is disgruntled that someone is handling his money and his property when he feels that he can be doing it." CP at 204-05. Mr. Pinkerton felt strongly that the need for the guardianship continued but that "Theodore's continual denial of his need for a Guardianship will be a contributing factor in the degree of difficulty the Guardian will face in this case." CP at 205. For this and other reasons, Mr. Pinkerton reported that he had come to a "very strong conclusion that a non-professional Guardian is not an appropriate Guardian for Theodore Alsup." *Id.*

Mr. Pinkerton was aware of the marriage of Mr. Alsup and Ms. Warren that had taken place several months earlier; the order appointing him as guardian ad litem had requested that he consider Ms. Warren as a potential guardian. He expressed reservations about Ms. Warren's service as guardian and questions about her relationship with Mr. Alsup and her motives.

Mr. Pinkerton reported that when he initially asked Mr. Alsup about his relationship with Ms. Warren, Mr. Alsup answered that it was "'very, very good,'" and stated that he wanted Ms. Warren to be his guardian. CP at 207. Mr. Alsup's caregiver later called Mr. Pinkerton with Mr. Alsup on the line, however, and explained that Mr.

6

Alsup was upset that Ms. Warren had not been to see him for 1½ to 2 weeks and asked the caregiver to call and let Mr. Pinkerton know that he was upset and wanted an "'annulment'" from Ms. Warren. CP at 211.

Mr. Pinkerton had several concerns about Ms. Warren being given responsibility for Mr. Alsup's finances. He interviewed her and learned that she was working more than full time, at two jobs, but had experienced problems with credit and money issues in the past. She had filed for bankruptcy 5 or 6 years earlier and had been required to pay a fine a year earlier in connection with her guilty plea to some sort of charge for unlawful issuance of a check. She expressed interest in serving as Mr. Alsup's guardian, explaining that the only reason she and Mr. Alsup were not living together was because of her jobs; she did not believe Mr. Alsup could be left alone. She told Mr. Pinkerton that if she were serving as guardian, she would quit her daytime job with the local school district.

Mr. Pinkerton ultimately recommended that the court appoint a professional guardian, Eagle Guardianship and Professional Services, as limited guardian. His report to the court also recommended that the future guardian "consider analyzing and potentially dealing with" issues associated with the marriage, the first being:

> Should the marriage between Theodore Alsup and Nikki Warren continue? If at some time in the future, Theodore Alsup's position is that he does not wish to be married, I recommend that the Guardian look into whether an annulment is a possible option or if a divorce is a necessary process to pursue.

CP at 212.

7

Eagle Guardianship was appointed and served as limited guardian for over eight years, up until the time of Mr. Alsup's death. No action was taken during that time to challenge Mr. Alsup's and Ms. Warren's marriage. According to Ms. Warren, Mr. Alsup spent weekends with her for approximately a year after the marriage—as long as he was living in a group home in Moses Lake—but after he was transferred to Eagle Guardianship in Spokane, she lacked the financial resources to drive to Spokane and pay for lodging. According to her, Mr. Alsup would sometimes book a motel room so she could visit but they mostly maintained contact through telephone conversations. She contends that he resisted pressure from his family to end their marriage and wanted to stay married. She points out that in or about 2009, he arranged for Eagle Guardianship to send her $1,500 so that she could repair her car.

Following Mr. Alsup's death, Andreda Golden, Mr. Alsup's foster sister, filed a petition for letters of administration on June 17, 2011, representing that Mr. Alsup had died intestate. She asked that she be appointed personal representative. In listing Mr. Alsup's heirs, Ms. Golden did not identify Ms. Warren.

Ten days later, Ms. Warren appeared in the probate action and filed her own petition alleging that Mr. Alsup had died testate based on the January 2001 will and that she was a pretermitted spouse.

Ms. Golden objected to Ms. Warren's request for appointment as personal representative, after which the two women jointly moved for the appointment of an

independent personal representative. The trial court granted the motion and appointed a Spokane lawyer to serve as personal representative. The personal representative thereafter requested a declaratory judgment from the court on the validity of the will and marriage. Ms. Warren filed a second petition, again requesting that the will be admitted to probate and that she be determined to be a pretermitted heir and that her inheritance be ordered by the court. She then moved for summary judgment granting the relief requested by her petitions.

After hearing argument on the parties' petitions and motion, the court concluded, as to the will, that the guardianship created in 1997 was a full guardianship, that Mr. Alsup "was not granted or given any rights or privileges under the 1997 Guardianship Order, including the right to marry or create and/or execute a Will," that the guardianship order "effectively blocked" Mr. Alsup from executing a will without prior court approval, and that the January 2001 will was "invalid and void because the Decedent did not have the capacity to create a Will and did not have Court authority to create a Will." CP at 156.

As to the marriage, the court concluded that while the guardianship had by then been modified to a limited guardianship, "the decedent did not have the authority or capacity to enter into ANY contract"; that "Washington law defines marriage as a contract"; and that despite Mr. Alsup's death, the court had authority to void a marriage "where no marriage existed." CP at 157.

9

The trial court's order was based entirely on legal conclusions, some erroneously labeled as findings, drawn from the orders appointing guardians of Mr. Alsup's person and estate. The personal representative had asked the court to invalidate the marriage on an alternative common law basis of "exceptional circumstances indicating fraud of the grossest kind," recognized in *In re Estate of Lint*, 135 Wn.2d 518, 538, 539-41, 957 P.2d 755 (1998), but the trial court did not reach that issue.

Ms. Warren appeals.

## ANALYSIS

Ms. Warren raises threshold and substantive issues challenging the trial court's determination that the will and marriage are invalid. We first address the will and then the marriage.

### I. Validity of the January 2001 Will

#### A. Challenge to jurisdiction

Ms. Warren's threshold challenge to the trial court's order determining Mr. Alsup's 2001 will to be invalid is to the court's jurisdiction. She argues that the personal representative was required but failed to provide notice required by RCW 11.24.020. A trial court's lack of jurisdiction may be raised for the first time on appeal. RAP 2.5(a)(1).

Chapter 11.24 RCW governs the conduct of "will contests," by which it refers to a proceeding commenced "within four months immediately following the probate [of a will] or rejection thereof" for the purpose either of contesting the validity of the will or

appearing to have a will proven that has been rejected. RCW 11.24.010. The party contesting probate or the rejection of probate is required by RCW 11.24.020 to give a form of notice, also called a citation, which "is the counterpart of a summons in ordinary civil proceedings" and is "the method for bringing all adverse parties before the court." *In re Estate of Palucci*, 61 Wn. App. 412, 415, 810 P.2d 970 (1991). It is undisputed that the personal representative did not give the form of notice required by the statute. Given the manner in which proceedings unfolded in the trial court, we agree with the personal representative that the notice was not required.

The letters of administration issued to the personal representative in August 2011 indicated that Mr. Alsup had died intestate. While Ms. Warren filed a petition to admit Mr. Alsup's will to probate, the trial court never entered an order probating or rejecting the will. Instead, it considered and decided the personal representative's request for declaratory judgment and Ms. Warren's motion for summary judgment.

Because the trial court did not probate the will or reject it from probate, the will contest procedure provided by chapter 11.24 RCW was never implicated.

### B. Validity of the will

Ms. Warren challenges the trial court's determination that Mr. Alsup's will was "invalid and void because the Decedent did not have the capacity to create a Will and did not have Court authority to create a Will." CP at 156. While denominated a "finding," it is clear that the personal representative asked the court to draw a legal conclusion from

11

the terms of the 1997 guardianship order, which is what the court did. We review issues of law de novo. *Klem v. Wash. Mut. Bank*, 176 Wn.2d 771, 782, 295 P.3d 1179 (2013). The trial court erred in concluding that the appointment of a full guardian automatically divested Mr. Alsup of the right to make a will.

"The right to dispose of one's property by will is not only a valuable right, but is one assured by law." *Dean v. Jordan*, 194 Wash. 661, 668, 79 P.2d 331 (1938). To exercise that right one must, of course, possess testamentary capacity. *Id.* RCW 11.12.010 provides that "[a]ny person of sound mind who has attained the age of eighteen years may, by last will, devise all of his or her estate, both real and personal."

It is well settled that "the fact that a guardian has been appointed to conserve the estate of one adjudged incompetent to manage it herself does not necessarily tend to establish lack of capacity on the ward's part to execute a will (whether the adjudication of incompetency precedes or follows the execution of the will), unless the order appointing the guardian is based upon an express finding of some mental defect inconsistent with the possession of the capacity required for the execution of a will." *In re Estate of Bottger*, 14 Wn.2d 676, 697, 129 P.2d 518 (1942).

> The appointment of such a guardian is not an adjudication that the ward is insane, nor does it in all cases imply that the ward is not fully capable of making a valid testamentary disposition of his property. A person may indeed be incapable of managing and conserving a large estate and yet be perfectly able to understand the nature of a will, to comprehend the extent of his property, and to recall the natural objects of his bounty. In short, he

12

> may require a guardian to supervise his estate and yet be competent to make a valid will disposing of it upon his death.

*Id.* (citations omitted). This appears to be the general rule. *See* A.G. Barnett, Annotation, *Effect of Guardianship of Adult on Testamentary Capacity*, 89 A.L.R.2d 1120, § 2 (1963) (collecting cases supporting the general rule "that one otherwise of testamentary capacity may make a valid will, regardless of the fact that he is under guardianship").

Even the express finding in a guardianship proceeding of a mental defect inconsistent with testamentary capacity gives rise to only a presumption that the incapacitated person was or remained incapable of making a will. The proponent of a will may overcome the presumption by showing that the capacity of the testator had been restored or there was a lucid interval at the time of executing the will. *Dean*, 194 Wash. 661 (testatrix who had once been adjudged insane and institutionalized was found to have had testamentary capacity to later execute a will); *and see In re Estate of Forsman*, 177 Wash. 38, 30 P.2d 941 (1934) (contest over will prepared following appointment of a guardian for the person and estate; competence disputed); *In re Estate of Miller*, 10 Wn.2d 258, 116 P.2d 526 (1941).

The personal representative acknowledges this case law but characterizes *Bottger* and other cases as "[e]arly Washington decisions" that do not address what he characterizes as a distinct issue: not mental capacity, but the "'right'" to make a will, which he argues is divested when a court establishes a full guardianship. Br. of Resp't

13

at 14. The only authority he cites for this proposition is RCW 11.88.030(5)(b),[1] which requires a party petitioning for appointment of a guardian to provide the allegedly incapacitated person with a notice that identifies "the legal rights of the alleged incapacitated person that could be restricted or transferred to a guardian by a guardianship order." The subsection then provides that the notice shall be "in substantially the following form" and includes a proposed form of notice that states, in part, "IF A GUARDIAN IS APPOINTED, YOU COULD LOSE ONE OR MORE OF THE FOLLOWING RIGHTS: . . . (3) TO ENTER INTO A CONTRACT OR MAKE OR REVOKE A WILL." Nowhere in chapter 11.88 RCW has the legislature provided that if a full guardian is appointed, an incapacitated person *will* lose the right to make a will.

For many reasons, the personal representative's argument from the statute's suggested form of notice is unpersuasive. The suggested notice language on which he relies is not a substantive part of the statute. It was added in 1990, in a substantial overhaul of chapter 11.88 RCW that our Supreme Court has characterized as "removing language that the passage of time had rendered offensive to the modern ear and updating procedures to reflect current realities." *Rivas v. Overlake Hosp. Med. Ctr.*, 164 Wn.2d 261, 270 n.3, 189 P.3d 753 (2008) (citing LAWS OF 1990, ch. 122). The thrust of the

---

[1] We note that the personal representative cites to the current subsections of RCW 11.88.030, which were renumbered by the Laws of 2011, ch. 329, § 2, effective July 22, 2011. At the time of Mr. Alsup's death, this subsection was numbered (4)(b).

14

1990 changes was to abate unwarranted limitations on the right of the ward, not to increase them; RCW 11.88.005 was revised, for example, to express the legislative intent "to protect the liberty and autonomy of all people of this state, and to enable them to exercise their rights under the law to the maximum extent, consistent with the capacity of each person," and that the liberty and autonomy of a person "should be restricted through the guardianship process only to the minimum extent necessary to adequately provide for their own health or safety, or to adequately manage their financial affairs."

Two other substantive statutes contradict the personal representative's position (accepted by the trial court) that a person found to be incapacitated and subject to a full guardianship has a right to execute a will only if given permission to do so by the court. The first, already mentioned, is RCW 11.12.010, which recognizes the right of adults of "sound mind" to devise their estates. The test of a "sound mind," or testamentary capacity, is whether the individual has

> "sufficient mind and memory to intelligently understand the nature of the
> business in which he is engaged, to comprehend generally the nature and
> extent of the property which constitutes his estate and which he intends to
> dispose of, and to recollect the objects of his bounty."

*In re Estate of Reilly*, 78 Wn.2d 623, 646, 479 P.2d 1 (1970) (quoting *In re Estate of Schafer*, 8 Wn.2d 517, 520, 113 P.2d 41 (1941)). This test is different from the standards

15

applied in determining whether an individual is incapacitated for purposes of appointing a guardian.[2]

If an incapacitated person is of sound mind, then RCW 11.12.010 gives him or her the unqualified right to devise his or her estate. If the incapacitated person is not of sound mind, then the statute implicitly provides that he or she is incapable of effectively devising an estate. The personal representative offers no explanation how a trial court's "permission" can substitute for the statutory requirement of testamentary capacity.

---

[2] An individual may be deemed incapacitated as to person when he or she "has a significant risk of personal harm based upon a demonstrated inability to adequately provide for nutrition, health, housing, or physical safety." RCW 11.88.010(1)(a). An individual may be deemed incapacitated as to the individual's estate when he or she "is at significant risk of financial harm based upon a demonstrated inability to adequately manage property or financial affairs." RCW 11.88.010(1)(b).

A relatively recent Virginia decision contrasts degrees of capacity required to make a will and manage ongoing financial affairs in terms that are consistent with Washington case law, and helpful here:

> "Mental weakness is not inconsistent with testamentary capacity. A less degree of capacity is requisite for the execution of a will than for the execution of contracts and the transaction of ordinary business. One may be capable of making a will yet incapable of disposing of his property by contract or of managing his estate. Mental strength to compete with an antagonist and understanding to protect his own interest are essential in the transaction of ordinary business, while it is sufficient for the making of a will that the testator understands the business in which he is engaged, his property, the natural objects of his bounty, and the disposition he desires to make of his property. The condition of being unable, by reason of weakness of mind, to manage and care for an estate, is not inconsistent with capacity to make a will."

*Parish v. Parish*, 281 Va. 191, 198, 704 S.E.2d 99 (2011) (quoting *Gilmer v. Brown*, 186 Va. 630, 637, 44 S.E.2d 16 (1947)).

A second statute, RCW 11.92.140, provides that if an incapacitated person has more assets than needed for his own maintenance and support, the guardian may (but need not) petition the court for authority to take actions or apply those discretionary assets

> in any fashion the court approves as being in keeping with the incapacitated person's wishes so far as they can be ascertained and as designed to minimize insofar as possible current or prospective state or federal income and estate taxes, permit entitlement under otherwise available federal or state medical or other assistance programs, and to provide for gifts to such charities, relatives, and friends as would be likely recipients of donations from the incapacitated person.

The provision undermines the personal representative's argument that incapacitated persons cannot make wills without court permission, in at least three ways.

First, the statute recognizes that it can be possible to ascertain the donative and charitable intent and wishes of a person even after the person has been found incapacitated and in need of a guardian. Second, it recognizes that what the guardian personally thinks should be done with discretionary assets is inconsequential; approval of a disposition depends entirely on demonstrating to the court that a disposition is either consistent with the incapacitated person's ascertainable intentions or, if those intentions cannot be ascertained, then that it will reduce taxation. Third, given its related subject matter, this would be the logical provision in which to address a guardian's petition for authority for an incapacitated person to make a will if the legislature had ever intended courts to dictate whether incapacitated persons may devise their estates—yet court

17

approval for the making of a will is not addressed in this provision or anywhere else in Title 11 RCW.

One can imagine situations in which a petition to appoint a guardian might specifically raise the allegedly incapacitated person's perceived lack of testamentary capacity to make or revoke a will. In appointing a guardian, and if presented with relevant evidence, a court might make an express finding that an incapacitated person presently lacks the testamentary capacity to make or revoke a will. That would create a presumption of lack of testamentary capacity that a will proponent might later be unable to overcome. The language in RCW 11.88.030(5)(b) that the personal representative and the court relied upon is reasonably read to refer to this possibility. The statute does not abrogate *Bottger, Jordan, Forsman,* or *Miller,* all of which remain good law.

Because the trial court based its conclusion that the will was invalid on the 1997 guardianship order, it erred. Further proceedings are required to determine the factual issue of whether Mr. Alsup possessed testamentary capacity at the time he executed the 2001 will.

## II. Validity of the 2002 Marriage

### A. Challenge to jurisdiction and abatement

Turning to the marriage, Ms. Warren makes the threshold argument that the personal representative lacked standing to assert the invalidity of the marriage, and as a result, the trial court lacked jurisdiction to enter the order declaring her marriage to Mr.

Alsup void. "Absent a party with standing, courts lack jurisdiction to consider the challenge." *Postema v. Snohomish County*, 83 Wn. App. 574, 579, 922 P.2d 176 (1996). Here again, a trial court's lack of jurisdiction may be raised for the first time on appeal. RAP 2.5(a)(1); *see also Roberson v. Perez*, 119 Wn. App. 928, 933, 83 P.3d 1026 (2004) (the insufficiency of a factual basis to support standing may be raised for the first time on appeal), *aff'd*, 156 Wn.2d 33, 123 P.3d 844 (2005). Alternatively, Ms. Warren argues that the marriage, even if voidable, was not void, and that with Mr. Alsup's death the right of any party to challenge it abated.

RCW 26.04.130 provides:

> When either party to a marriage shall be incapable of consenting thereto, for want of legal age or a sufficient understanding, or when the consent of either party shall be obtained by force or fraud, such marriage is voidable, *but only at the suit of the party laboring under the disability*, or upon whom the force or fraud is imposed.

(Emphasis added.) This provision has been "read restrictively so as to allow only a party to the defective marriage to initiate the suit." Luvern V. Rieke, *The Dissolution Act of 1973: From Status to Contract?*, 49 WASH. L. REV. 375, 391 & n.64 (1974); *In re Estate of Romano*, 40 Wn.2d 796, 800, 246 P.2d 501 (1952) (applying the statute to dismiss, on standing grounds, the petition of an executrix and legatees under a will seeking to invalidate the decedent's marriage).

The personal representative concedes that he lacked standing under this statute to challenge the validity of the marriage on the basis that Mr. Alsup was incapable of

consenting "for want of . . . sufficient understanding." But he argues that he could still challenge the marriage on the basis that the February 2001 order modifying the guardianship imposed the limitation that Mr. Alsup "shall not have the authority to enter into any contract," and marriage, he argues, is a contract. CP at 170. We need not construe the scope of the court's limitation on Mr. Alsup's authority to enter into a contract[3] because another statute, RCW 26.09.040, provides that even those challenges to a marriage that may be brought by persons other than the husband or wife must be brought and resolved during the couple's lifetimes. This includes challenges to a marriage that "should not have been contracted because of . . . lack of required . . . court approval" and those that "should not have been contracted because of any reason other than those [itemized by the statute]." RCW 26.09.040(4)(b)(i)-(ii). "[T]he death of a spouse abates any pending proceeding to declare the marriage to be invalid." 21 KENNETH W. WEBER, WASHINGTON PRACTICE: FAMILY AND COMMUNITY PROPERTY LAW § 48.33, at 164 (1997) (noting that this is "clearly indicate[d]" by "the language of RCW 26.09.040 and its drafting history"); 20 KENNETH W. WEBER, WASHINGTON

---

[3] We note, however, that "the prevailing rule is that while the marriage relation is entered into by civil contract, the rights, duties and obligations incident to the relationship are governed by statute. . . . '[J]udicial opinions illustrate the universal opinion that the marriage relation is a status, and that the act of contracting marriage results in a change of status.'" *Wash. Statewide Org. of Stepparents v. Smith*, 85 Wn.2d 564, 568, 536 P.2d 1202 (1975) (quoting JOSEPH W. MADDEN, HANDBOOK OF THE LAW OF PERSONS AND DOMESTIC RELATIONS, §§ 1-3, at 4 (1931)).

PRACTICE: FAMILY AND COMMUNITY PROPERTY LAW § 43.6, at 571 (1997) (noting that RCW 26.09.040 "[t]erminates the right to attack the validity of the marriages if one of the spouses is deceased.").

Ms. Warren's threshold arguments are well taken. By statute, the lack of court approval for the marriage, even if required, could not be raised after Mr. Alsup's death.

### B. Alternative argument: "fraud of the grossest kind"

Both below and in this court, the personal representative argues alternatively that the marriage should be declared invalid on a common law basis not reached by the trial court: "under exceptional circumstances indicating fraud of the grossest kind, without apparent opportunity to detect or correct the inequity during the lifetime of the deceased spouse, a collateral attack after death has been permitted." *Romano*, 40 Wn.2d at 806 (citing *Savage v. Olson*, 151 Fla. 241, 9 So. 2d 363 (1942); *Guthery v. Ball*, 206 Mo. App. 570, 228 S.W. 887 (1921)). While *Romano* recognized the common law exception in dicta, our Supreme Court later held in *Lint* that "there is merit to the view . . . expressed many years ago in *Romano*" that the grounds set forth in RCW 26.09.040 for declaring a marriage invalid do not specifically include "exceptional circumstances indicating fraud of the grossest kind." 135 Wn.2d at 540-41. The personal representative asks that we remand the issue of the validity of the marriage to the trial court, for consideration of whether this case falls within the *Lint* exception.

21

A remand for this purpose is not warranted. An argument based on *Lint* was presented in the trial court and the parties submitted relevant evidence. Based on that evidence the issue can be decided as a matter of law, as it was in *Romano*.

In *Romano*, the fact that the disabled spouse lived almost two years after the marriage and there was nothing to indicate that his mental condition was unknown was fatal to the attempt to invalidate the marriage, since "[t]here was ample time during Romano's lifetime for his general guardian or some next friend to make a direct attack, in Romano's behalf, upon the validity of this marriage." 40 Wn.2d at 806. Here, the record is clear that Mr. Pinkerton, the guardian ad litem, was aware in 2002 of Mr. Alsup's then-recent marriage and brought it to the attention of the superior court and the professional guardian. No action was taken to attack the validity of the marriage for the more than eight-year duration of the marriage preceding Mr. Alsup's death.

There is no basis on which the trial court's finding that the marriage was invalid can be sustained. Ms. Warren was entitled to summary judgment in her favor that she is entitled to inherit as a surviving spouse, whether because she was omitted from the 2001 will or by intestate succession.

### III.    Attorney Fees

Ms. Warren requests reasonable attorney fees on appeal under RCW 11.96A.150, arguing that her actions in this case benefited the estate by establishing Mr. Alsup's final wishes. She also claims that the personal representative needlessly burdened the estate

22

by making a postdeath challenge to the marriage even though he lacked standing. The personal representative objects to the requested award.

RCW 11.96A.150(1) provides us with broad discretion to award costs, including attorney fees, to any party

> (a) From any party to the proceedings; (b) from the assets of the estate or trust involved in the proceedings; or (c) from any nonprobate asset that is the subject of the proceedings. The court may order the costs, including reasonable attorneys' fees, to be paid in such amount and in such manner as the court determines to be equitable. In exercising its discretion under this section, the court may consider any and all factors that it deems to be relevant and appropriate, which factors may but need not include whether the litigation benefits the estate or trust involved.

This statute "allows a court considering a fee award to consider any relevant factor, including whether a case presents novel or unique issues." *In re Guardianship of Lamb*, 173 Wn.2d 173, 198, 265 P.3d 876 (2011).

The validity of Mr. Alsup's will and marriage created conflicting interests between known individuals with potential claims to the estate. We have concerns about the extent to which the personal representative appears to have weighed in on one side.

That being said, the circumstances of the marriage and preparation of the will, particularly in light of Mr. Alsup's health problems and resulting limitations, warranted investigation and legal analysis. While the personal representative persuaded the trial court to reach determinations that prove to have been wrong, it is understandable that he defended the trial court's determinations once they were appealed. We exercise our

23

discretion to deny the award of fees and costs requested by Ms. Warren. In denying fees, we suggest that in the limited proceedings that remain to be resolved in the trial court, the personal representative should be scrupulously evenhanded, recognize the importance of preserving the assets of the estate, and allow parties with conflicting interests to advocate for themselves.

We reverse the trial court's determinations that the will and the marriage were invalid. We remand with instructions to the trial court to (1) enter summary judgment determining that Ms. Warren is entitled to a share of Mr. Alsup's estate (testate or intestate) as a surviving spouse, (2) hear the proofs offered in support of the application for probate of the 2001 will and either probate or reject the will as the testimony may justify, and (3) engage in such further proceedings as are consistent with this opinion and required to close the estate.

_____
Siddoway, C.J.

WE CONCUR:

_____
Brown, J.

_____
Korsmo, J.

24