# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Estate of<br><br>TIMOTHY G. BURGMAN,<br><br>                  Deceased. | No. 59916-3-II |
| KATHLEEN BLANCHETTE, individually and as a beneficiary of the Estate of Timothy G. Burgman; and TERESA GOEN BURGMAN, individually and as a beneficiary of the Estate of Timothy G. Burgman,<br><br>                  Appellants,<br><br>    v.<br><br>TIMOTHY GEORGE BURGMAN, individually and as Personal Representative of the Estate of Timothy G. Burgman; JOSEPH BURGMAN, individually; JENNIE BURGMAN, individually; RYAN BURGMAN, individually; KAI BURGMAN, individually; KALIN BURGMAN, individually; THEODORA BURGMAN, individually; and MAGDELENA BURGMAN, individually,<br><br>                  Respondents. | UNPUBLISHED OPINION |

GLASGOW, J.—Timothy Burgman passed away in April 2019 after experiencing serious health issues. He was survived by five children: Timothy George Burgman (George), Joseph Burgman (Joe), Kathleen Blanchette, Teresa Goen Burgman, and Jennie Burgman.[1]

---

[1] To avoid confusion, we refer to Burgman's children by their first names in this opinion.

In August 2018, Burgman was admitted to the hospital for a liver condition that caused him confusion. At that time, doctors noted that Burgman's cognitive function was reduced and he could not make decisions about his care.

In December 2018, Burgman executed a new will with the assistance of his sons, George and Joe. This will gave a majority share of the family business to Joe, who Burgman had intentionally excluded from prior wills. Medical records from December 2018 and January 2019 indicated that during that period, Burgman was alert, oriented, and able to make decisions. Additionally, the attorney who helped Burgman with the December 2018 will said that after several conversations with Burgman about the terms of the new will, he had no concerns that Burgman lacked mental capacity or that George and Joe were dictating the terms of the will.

After Burgman passed away, Burgman's daughters Kathleen and Teresa, filed a petition under the Trust and Estate Dispute Resolution Act (TEDRA) contesting the validity of the December 2018 will, arguing that Burgman lacked testamentary capacity and was unduly influenced by George and Joe. At trial, the trial court permitted an expert witness for the Estate to testify despite Kathleen and Teresa's motions to exclude his testimony. Although the trial court did not apply a presumption of undue influence, it concluded that even if it had, the presumption would have been overcome given the facts. The trial court ultimately denied Kathleen and Teresa's claims. The trial court also found that the contested expert provided little helpful testimony. Kathleen and Teresa appeal the trial court's order denying their claims and its admission of the expert's testimony.

We conclude that based on the evidence here, the trial court did not err by concluding that Burgman had testamentary capacity to execute the December 2018 will. And though the trial court

erred by failing to impose a presumption of undue influence given the specific facts in this case, the Estate presented sufficient evidence to support the trial court's alternative conclusion that the facts rebutted the presumption. Thus, the trial court did not err by concluding that Burgman was not subject to undue influence. Additionally, without the trial court's discussion of the expert's testimony or the testimony itself on our record, we decline to address its admissibility. Accordingly, we affirm. We also decline to award attorney fees on appeal.

FACTS

After a bench trial, the trial court denied Kathleen and Teresa's claims and entered thorough findings of fact. On appeal, Kathleen and Teresa only challenge three of these findings. Unchallenged findings of fact are verities on appeal. *Jubitz Corp. v. Dep't of Revenue*, 31 Wn. App. 2d 898, 907, 553 P.3d 700 (2024). Accordingly, we recite primarily the trial court's relevant unchallenged findings.

Timothy Burgman passed away on April 9, 2019. Burgman's wife had passed away nine years before him, in June 2010. Burgman had five surviving children when he passed away: George, Joe, Kathleen, Teresa, and Jennie.

Burgman and his wife owned all the shares of their family funeral home business. In 2010, before Burgman's wife passed away, Burgman and his wife created almost identical wills that specifically excluded Joe because his prior involvement in the family business "caused significant financial losses." Clerk's Papers (CP) at 980 (Finding of Fact (FF) 6). The record indicates that these financial losses were because Joe was stealing from the business. Our record contains a judgment and sentence showing that in 2008, Joe was found guilty of four counts of first degree theft. The judgment and sentence restricted him from certain activities related to the funeral home

business for 10 years. Burgman's and his wife's 2010 wills split their estates into five equal shares for George, Kathleen, Teresa, Jennie, and Joe's children.

After Burgman's wife died, Burgman experienced a number of serious health issues, including a liver condition causing a buildup of toxins in his blood that led to brain confusion. This condition can be treated with medication.

At the time of Burgman's passing, Kathleen and Teresa had both worked for the family business for several years and had positions on the board of directors. Jennie lived on property owned by the family business and had been the primary caregiver for her mother. Jennie has longstanding medical issues.

In 2016, Burgman asked Teresa to help him find an attorney to create a new will. In 2017, Burgman executed a new will and durable power of attorney with the assistance of attorney Joseph Frawley. Kathleen and Teresa participated in all meetings regarding the creation of these documents.

The durable power of attorney stated that Teresa and Kathleen would be Burgman's co-attorneys-in-fact upon his "disability or incompetence." CP at 549. The document said, "Disability may be established by a written statement of a qualified physician regularly attending [Burgman]." *Id.* Further, "[i]ncompetence may be established by a finding of a court having jurisdiction over [Burgman]." *Id.*

The durable power of attorney also stated that it "shall remain in effect to the extent permitted by Chapter 11.94 of the Revised Code of Washington until it is revoked." *Id.* It could be revoked by a written notice delivered to one of Burgman's attorneys-in-fact or delivered to a guardian of Burgman's estate after court approval of the revocation.

Specifically regarding the durable power of attorney for health care decision-making, the document outlined more specific guidelines. Burgman's attending physician had to state in writing that Burgman was no longer able to manage his own "personal and financial affairs"—though this determination "shall not be deemed a legal determination of incapacity but shall be used as the basis to make this Durable Power of Attorney effective." CP at 549. Or a court had to enter an order stating Burgman was incapacitated and could not handle his personal health care affairs.

The document also stated,

> If, at some future date I shall be found incapacitated according to the above-stated criteria, and then at a later date I shall be restored to capacity to manage my own affairs, as stated in writing by my attending physician, and there is no finding by a Court of competent jurisdiction that I am incapacitated, then this Durable Power of Attorney shall be no longer effective until the incapacity begins again.

*Id.*

Like Burgman's prior wills, Burgman's 2017 will also excluded Joe as a beneficiary. The 2017 will gave Jennie the "Vail Road" property, provided some money for the education of Burgman's grandchildren, and divided the rest of the estate equally among Kathleen, Teresa, and George. CP at 983 (FF 20). The 2017 will listed Kathleen and Teresa as coexecutors of Burgman's estate.

In June 2018, several of Burgman's children were involved with his care. Joe was Burgman's primary source of transportation, though all of Burgman's children assisted. Burgman "was not isolated from anyone in his family." CP at 984 (FF 22).

In late June 2018, Burgman was admitted to the hospital because of increased confusion. At the time, Burgman was "catatonic," and medical records described him as "'only oriented to self.'" *Id.* (FF 23).

While Burgman was hospitalized, Kathleen and Teresa attempted to get his affairs in order, including reopening Burgman's mother's probate estate to properly distribute property she had given to Burgman. Kathleen spoke to Burgman's treating physician, Dr. Jaekyung Song, who wrote a letter about Burgman's condition on July 3, 2018:

> Due to [Burgman's] medical condition, [his] functional status is severely reduced. . . . He is not able to ambulate . . . Due to his medical condition, he developed confusion and encephalopathy. He requires continued medical therapy for his encephalopathy. It is unclear at this time when or if his function . . . status and mental status will return to his usual baseline.

CP at 984-95 (FF 26) (third and fourth alteration in original).

In July 2018, Burgman moved from the hospital to a skilled nursing facility. At this point, he could walk and speak, but he scored 1 out of 30 on a screening test for cognitive awareness. In August 2018, Dr. James Buttitta, a doctor treating Burgman at the nursing facility, signed a declaration that Burgman "was suffering from confusion, and he could not make decisions regarding his care or any other decisions." CP at 986 (FF 29).

In August 2018, Kathleen and Teresa filed a petition to reopen the probate of Burgman's mother's estate, stating that Burgman, who was the personal representative of the estate, had become mentally unfit. A trial court granted this petition, appointing Kathleen and Teresa as copersonal representatives of Burgman's mother's estate and stating that Burgman had "'become unfit to serve as personal representative of the estate, because he is no longer of sound mind and competent to serve.'" *Id.* (FF 31). Kathleen and Teresa did not tell Burgman that they had invoked the durable power of attorney and reopened the probate of his mother's estate.

After Burgman was released from care facilities in 2018, all his children assisted with his care. Joe provided most of Burgman's physical assistance and transportation. Burgman would sometimes go to the family business office and spend time in Joe's office.

On October 5, 2018, records from Burgman's primary care doctor stated that his condition causing confusion was "'stable/resolved.'" CP at 988 (FF 39) (quoting record).

In early November 2018, Burgman had a family meeting with his children. At this meeting, Burgman expressed anger at Kathleen and Teresa for invoking the durable power of attorney so they could be appointed as personal representatives of his mother's probate estate. George had informed Burgman of the steps Kathleen and Teresa had taken to replace him as representatives of his mother's estate while he was ill. Burgman "clearly expressed his desire to have the [durable power of attorney] made ineffective but did not specify how this should be done." *Id.* (FF 40). Shortly after this meeting, Burgman returned to the hospital because of weakness and multiple falls.

On December 4, 2018, medical records from Burgman's primary care doctor said that he was "chronically ill and weak," and noted that he specifically requested "'no more hospitalization.'" CP at 989 (FF 45) (quoting record). George and Joe asked Burgman's primary care doctor to evaluate Burgman's cognitive status. The doctor declined and recommended a neurologist.

On December 6, 2018, Burgman met with Frawley at his law office to create a new will. Joe arranged this meeting and had prepared a draft of a will and provided it to Frawley. In this draft, Joe would receive 60 percent of the family business, and Kathleen and Teresa each would receive 20 percent of the family business. George would receive the "Bald Hills" property and no

shares of the family business. George and Joe both attended the December 6, 2018, meeting between Burgman and Frawley. Nobody informed Kathleen or Teresa of this meeting.

At trial, Frawley testified credibly that, at this meeting, Burgman dictated the terms of the new will and Frawley and Burgman discussed these terms extensively. Frawley said that he had "no concerns about [Burgman's] competency or ability to understand the preferences being expressed." CP at 990 (FF 49). Frawley further testified that George and Joe did not direct any terms or content for the new will during the meeting. Frawley said that he understood Burgman specifically wanted to write Joe back into the will and wanted to provide Jennie with a stipend for the rest of her life, as Burgman was concerned she could not manage the Vail Road property. Frawley also got the impression that Burgman did not care for something that Kathleen and Teresa had done. Frawley suggested that Burgman include more thorough estate planning in the new will, but Burgman said he wanted a simple will with few details.

Frawley told Burgman, George, and Joe that he would not execute a new will for Burgman without a doctor's note confirming Burgman's competence. Frawley testified that he requested this letter "not because he had any questions about [Burgman's] competency, but because he sensed underlying family dynamics and a potential future dispute." CP at 991 (FF 52).

Two days after this meeting, on December 8, 2018, Burgman was admitted to the hospital again. On December 14, Burgman met with a speech language pathologist for a cognitive assessment. The speech language pathologist noted that Burgman,

> "[w]as oriented to time, place and situation very well. In answering questions related to problem solving, he was able to give [rational] solutions to various scenarios, however when asked for more than one solution, he struggled with flexibility. He is able to comprehend conversational topics well, though struggled with complex processing. During conversational speech, he was able to relay events

of the day, likes and dislikes, give steps to a familiar task and recall topics after a short amount of time."

*Id.* (FF 54) (quoting record).

Burgman's medical records from this hospital stay indicate that Burgman's family requested documentation of his cognitive status. In Burgman's medical notes, Dr. David Newton, an attending physician, wrote that Burgman was "'seen for cognitive assessment with son present.'" CP at 992 (FF 57) (quoting record). On December 17, Dr. Newton interviewed Burgman. On this date, Dr. Newton did not perform an official cognitive exam. However, based on his interactions with Burgman, Dr. Newton wrote a letter:

> "[Burgman] was able to answer basic questions of orientation correctly. He is able to state his name, the date, the location of our visit, and his reason for being hospitalized. He is also able to state his wishes clearly at this time. This is not a formal in-depth analysis of cognitive ability, but a general sense that he is able to express [] his preferences and provide appropriate reasoning for his wishes."

*Id.* (FF 58) (quoting record). The end of this letter stated, "If additional information were sought, I would recommend a formal neuropsychological evaluation. This is an assessment that is typically performed as an outpatient and not available for patients hospitalized for acute conditions, and is therefore not within my scope of practice." Ex. 511. At trial, Dr. Newton testified that the point of this letter was to indicate that it was "not the right time or place to determine competency," and that he was "not the doctor that determines competency." Verbatim Rep. of Proc. (VRP) (May 14, 2024) at 120.[2]

---

[2] There are several, separately paginated excerpts of the trial in the record on appeal with overlapping dates that are not appropriately separated by volume number. We cite the report of proceedings consecutively paginated from 1 to 335 as the VRP in this opinion.

Medical records from December 18 state that the condition causing Burgman's confusion was "'stable/resolved.'" CP at 992 (FF 60) (quoting record). On December 20, Burgman was discharged from the hospital, and notes from that date indicate that the condition had been resolved with medication.

Kathleen and Teresa never received a written notice revoking their durable power of attorney. However, the trial court found that "[b]ased upon the testimony and evidence, [Burgman] was restored to capacity to manage his affairs under the terms of the [durable power of attorney] by the time of his discharge." CP at 993 (FF 61).

On the day he was discharged from the hospital, Burgman immediately went to a meeting with Frawley where he executed a new will. Regarding this meeting, the trial court found,

> Mr. Frawley testified credibly that he could not remember if there were two or three meetings in total with [Burgman] but, at each meeting, he discussed with him, in detail, the terms of the new will. Mr. Frawley had no concerns that the terms of the 2018 Will were not being directed by [Burgman]. Mr. Frawley believed that [Burgman] understood the terms. Mr. Frawley's paralegal, Tricia Ziese, testified credibly, based on her interactions with [Burgman] during December 2018, she had no concerns about his competency.

*Id.* (FF 62).

Burgman's December 2018 will gave George the "Bald Hills" property and stated that any income generated from this property should be distributed with 30 percent going to George, 5 percent going to Theodora Burgman (George's daughter), 5 percent going to Magdalena Burgman (George's daughter), 25 percent going to Kathleen, 25 percent going to Teresa, and 10 percent going to Jennie. *Id.* (FF 63). Burgman directed George to pass down the property to Theodora and Magdalena.

The December 2018 will gave 52 percent of the family business to Joe and 16 percent each to Kathleen, Teresa, and George. Burgman said that he hoped Joe would pass down his interest in the business to his sons.

The December 2018 will also stated that the family business shall pay Jennie a $1,000 monthly stipend for the rest of her life. Frawley encouraged Burgman to create a trust for Jennie because the stipend provision was potentially unenforceable. However, Burgman declined this advice and directed Frawley to keep the provision. Frawley testified that Burgman "understood what a trust was, understood the advice being given, but declined to follow it because he believed his family would follow the wishes expressed in his will." CP at 994 (FF 65).

The December 2018 will divided the remainder of Burgman's estate equally among George, Kathleen, and Teresa.

On January 11, 2019, Burgman spoke with nurse Antoinette Taber at a hospice intake. Regarding this meeting, the trial court found,

> Ms. Taber testified credibly at trial regarding her records as she had no independent recollection of [Burgman]. Ms. Taber's records reflected that she did not perceive [Burgman] as suffering from any cognitive impairment. Although he was bed-ridden and could not feed or bathe himself, he was oriented, alert, and followed commands.

*Id.* (FF 66).

After Burgman passed away in April 2019, his December 2018 will was admitted to probate. Kathleen and Teresa filed a TEDRA petition contesting the validity of the December 2018 will.[3] Relevant here, Kathleen and Teresa argued that Burgman lacked testamentary capacity to

---

[3] The petition listed the Estate, George, Joe, Jennie, Joe's sons, and George's daughters as respondents. For efficiency, we refer to these respondents as "the Estate" in this opinion.

execute the will and that George and Joe unduly influenced Burgman to create and execute the will.

During discovery, Kathleen and Teresa asked the Estate to provide information about its expert witnesses, their relevant experience, and their anticipated testimony. The Estate initially responded that it had no known expert witnesses at the time. In September 2023, the Estate provided a list of experts, including Dr. Russell Vandenbelt. The Estate wrote that Vandenbelt may provide expert opinion testimony as a doctor and psychiatrist about the physical and mental status of Burgman, the examinations administered to Burgman, and the relevance of Burgman's conditions and behaviors described in the record.

Trial began on May 6, 2024. On May 13, Kathleen and Teresa moved to exclude Vandenbelt as a witness at trial because they had not received key information about his relevant experience and testimony. On May 15, the day before Vandenbelt was scheduled to testify, Kathleen and Teresa made a renewed motion to exclude Vandenbelt. In this motion, Kathleen and Teresa said that on May 14, their counsel and the Estate's counsel conferenced to discuss what to do about Vandenbelt. Kathleen and Teresa claimed that the Estate's counsel agreed the Estate would supplement its discovery regarding Vandenbelt at least 24 hours before he testified. The Estate subsequently provided a list of cases in which Vandenbelt testified but did not list the subject matter on which he testified or the information he relied on for his testimony. The Estate also did not include a summary of Vandenbelt's opinions about Burgman. Kathleen and Teresa argued that the information provided by the Estate was insufficient and that the only sanction appropriate to prevent prejudice was exclusion of Vandenbelt's testimony.

It is undisputed that Vandenbelt testified at trial. However, because Kathleen and Teresa only designated some witnesses' testimony to be included in our record, we do not have the trial court's discussion of Kathleen and Teresa's motion, its order denying Kathleen and Teresa's motion, or Vandenbelt's testimony. In its findings of fact, the trial court stated,

> Dr. Vandenbelt provided very limited helpful testimony. He did testify credibly that [Burgman's] hepatic encephalopathy that he suffered from in July and August 2018 had improved significantly by December 2018, based on his review of medical records.

CP at 992 (FF 59).

Based on all of its findings from trial, the trial court made several conclusions of law:

> 6. Petitioners have failed to establish by clear, cogent, and convincing evidence that [Burgman] lacked testamentary capacity. Testamentary capacity is determined at or near the time a will is executed. Petitioners have established that [Burgman] was temporarily cognitively impaired, due to his hepatic encephalopathy, during his hospital and rehabilitation stays in July and August 2018.

> 7. During the relevant time, on or near December 20, 2018, evidence from medical providers establishes that [Burgman] was alert, oriented as to time and place, able to engage in rational thought and clearly express his own wishes with appropriate reasoning. [Burgman] understood the changes being made to his estate planning and was directing those changes knowingly and intentionally. The testimony of Mr. Frawley and Ms. Ziese was consistent with the medical providers['] testimony. In December 2018, [Burgman] possessed testamentary capacity.

> 8. Dr. Newton's letter dated December 17, 2018, shows [Burgman] was able to manage his own affairs, and [Burgman] was restored to capacity to manage his affairs under the terms of the [durable power of attorney].

> 9. The Court previously concluded that the presumption of invalidity does not apply to this case. Now that the trial has concluded, the Court repeats that conclusion based on the testimony and evidence at trial. Even if this Court applied the presumption of invalidity, it has been overcome by evidence that [Burgman's] decisions made in his 2018 Will were intentional and rational.

10. Petitioners have failed to establish by clear, cogent, and convincing evidence that [Burgman] was the victim of undue influence. [Burgman] was influenced by his children, and certainly was influenced by his sons. However, undue influence has not been established. A will is the product of undue influence when a party interferes with the testator's free will, preventing the testator from exercising his own judgment and choice. The Court considered the fact that the testator's choices regarding his son Joe changed significantly. However, Petitioners have not identified any specific behavior or actions of any party herein which would establish undue influence.

. . . .

14. Petitioners have not shown that they are entitled to any relief at this time regarding particular terms or language in the 2018 Will and on this basis, Petitioners' request for declaratory relief concerning this subject is denied.

15. Petitioners challenged the 2018 Will believing, based on their understanding of the facts, that Joe and George improperly influenced their father in December 2018. Based on applicable law, the facts found by the Court at trial do not support invalidating the 2018 Will. [Burgman] purposefully included terms that may not have been easily understood by all or enforceable, but believing (incorrectly) that his children would understand his wishes and implement them without disagreement.

CP at 995-98 (Conclusions of Law (CL) 6, 7, 8, 9, 10, 14, 15).

Accordingly, the trial court denied Kathleen and Teresa's claims and dismissed the case.[4]

Kathleen and Teresa appeal.[5]

---

[4] The trial court initially consolidated this case with cases related to Burgman's wife's will. Before trial, the trial court bifurcated the claims related to Kathleen and Teresa's challenge of Burgman's will. After the trial court entered its findings of fact and conclusions of law from trial, it entered a partial final judgment dismissing these claims.

[5] We note that there are multiple factual assertions in Kathleen and Teresa's opening brief that do not include a citation to the record in violation of RAP 10.3(a)(5).

## ANALYSIS

### I. STANDARD OF REVIEW

After a bench trial, we assess whether a trial court's findings of fact are supported by substantial evidence. *In re Est. of Barnes*, 185 Wn.2d 1, 9, 367 P.3d 580 (2016). Substantial evidence is evidence sufficient to persuade a rational, fair-minded person of the truth of the premise. *Jubitz Corp.*, 31 Wn. App. 2d at 906.

"When a challenged factual finding is required to be proved at trial by clear, cogent, and convincing evidence, we incorporate that standard of proof in conducting [a] substantial evidence review." *In re Trust & Est. of Melter*, 167 Wn. App. 285, 301, 273 P.3d 991 (2012). When such a finding is appealed, we review whether there is substantial evidence that the fact at issue is "highly probable." *Id.*

Unchallenged findings of fact are verities on appeal. *Jubitz Corp.*, 31 Wn. App. 2d at 907. We review conclusions of law de novo to determine if they are supported by the findings of fact. *Barnes*, 185 Wn.2d at 9. "We defer to the trial court's determinations of the weight and credibility of the evidence." *Id.*

### II. TESTAMENTARY CAPACITY

A.     <u>Legal Principles</u>

A person has testamentary capacity if, at the time they execute a will, they have sufficient mind and memory to understand the transaction and to comprehend the nature and extent of their estate. *In re Est. of Bussler*, 160 Wn. App. 449, 461, 247 P.3d 821 (2011). Where a will is rational on its face and executed in legal form, we presume the testator had testamentary capacity and the will reflects their wishes. *Id.* "'In order to overcome a will, the evidence must be cogent and

convincing.'" *Id.* (internal quotation marks omitted) (quoting *In re Est. of Reilly*, 78 Wn.2d 623, 646, 479 P.2d 1 (1970)).

In *Bussler*, this court held that the fact that a family member had invoked the testator's power of attorney because the testator was experiencing increasing physical disability did not necessarily mean that the testator lacked testamentary capacity. *Id.* at 463-65.

In *In re Est. of Alsup*, a trial court appointed guardians for Alsup because he required 24-hour care in a nursing home. 181 Wn. App. 856, 861, 327 P.3d 1266 (2014). These guardians were appointed to supervise Alsup's nursing care, provide consent to medical providers, and handle his financial affairs. *Id.* at 861-62. While Alsup was subject to the guardianship—though he was petitioning to modify the guardianship—he executed a will. *Id.* at 863. Division Three held that the trial court erred by concluding that Alsup's will was necessarily invalid because of the existence of the guardianship. *Id.* at 874.

> Quoting the Washington Supreme Court, Division Three stated,
>
> It is well settled that "the fact that a guardian has been appointed to conserve the estate of one adjudged incompetent to manage it herself does not necessarily tend to establish lack of capacity on the ward's part to execute a will (whether the adjudication of incompetency precedes or follows the execution of the will), unless the order appointing the guardian is based on an express finding of some mental defect inconsistent with the possession of the capacity required for the execution of a will.
>
> The appointment of such a guardian is not an adjudication that the ward is insane, nor does it in all cases imply that the ward is not fully capable of making a valid testamentary disposition of his property. A person may indeed be incapable of managing and conserving a large estate and yet be perfectly able to understand the nature of a will, to comprehend the extent of his property, and to recall the natural objects of his bounty. In short, he may require a guardian to supervise his estate and yet be competent to make a valid will disposing of it upon his death."

*Id.* at 869-70 (quoting *In re Est. of Bottger*, 14 Wn.2d 676, 697, 129 P.2d 518 (1942)).

Division Three explained that even an express finding of a mental condition inconsistent with testamentary capacity in a guardianship proceeding only raises a presumption that the incapacitated person was incapable of making a will. *Id.* at 870. And "[t]he proponent of a will may overcome the presumption by showing that the capacity of the testator had been restored or there was a lucid interval at the time of executing the will." *Id.*

B.      Challenged Findings of Fact

Here, Kathleen and Teresa challenge several findings of fact related to Burgman's testamentary capacity. On appeal, we determine whether findings of facts are supported by substantial evidence. *Barnes*, 185 Wn.2d at 9.

1.      Finding of fact 62

First, Kathleen and Teresa challenge the trial court's finding of fact 62:

[Burgman] immediately went to a final meeting with Mr. Frawley where he executed the 2018 Will. Mr. Frawley testified credibly that he could not remember if there were two or three meetings in total with [Burgman] but, at each meeting, he discussed with him, in detail, the terms of the new will. Mr. Frawley had no concerns that the terms of the 2018 Will were not being directed by [Burgman]. Mr. Frawley believed that [Burgman] understood the terms. Mr. Frawley's paralegal, Tricia Ziese, testified credibly, based on her interactions with [Burgman] during December 2018, she had no concerns about his competency. The 2018 Will was signed on December 20, 2018.

CP at 993 (FF 62).

Evidence supporting this finding included Frawley's testimony. Frawley testified that at his first meeting with Burgman about the December 2018 will, Burgman stated that he wanted to write Joe back into the will regarding the family business. Frawley said that Burgman expressed frustration with how the family business was being managed. Frawley testified that at this first meeting, he discussed the terms of the new will in detail with Burgman, and Frawley had no

concerns about Burgman's ability to understand the nature of discussion or the extent of his assets. Additionally, George and Joe did not dictate the terms of the new will.

Frawley said that he remembered having either two or three meetings with Burgman about the December 2018 will. At the meeting where Burgman executed the will, Frawley and Burgman again discussed the terms of the will. Frawley did not have concerns about Burgman's competency to execute a will on that day either.

Ziese testified that on the occasions she interacted with Burgman when he walked into Frawley's office, she was never concerned about his competency or that he was unfairly influenced by his children.

Based on our review of the record, Frawley's and Ziese's testimony supports the trial court's finding. And we defer to the trial court's determinations that Frawley's and Ziese's testimony was credible. *Barnes*, 185 Wn.2d at 9. We also defer to the trial court's determination of how to weigh the evidence. *Id.* Accordingly, we conclude this finding is supported by substantial evidence.

2.    Finding of fact 66

Kathleen and Teresa also challenge finding of fact 66:

On January 11, 2019, [Burgman] was interviewed by Antoinette Taber, RN, for an intake concerning hospice services. Ms. Taber testified credibly at trial regarding her records as she had no independent recollection of [Burgman]. Ms. Taber's records reflected that she did not perceive [Burgman] as suffering from any cognitive impairment. Although he was bed-ridden and could not feed or bathe himself, he was oriented, alert, and followed commands.

CP at 994 (FF 66).

Upon our review of the record, Taber testified that she conducted a hospice intake with Burgman on January 11, 2019. Taber said that these intakes usually take between one to two hours.

18

While Taber did not have independent memory of Burgman's intake, she confirmed that her records said Burgman was "oriented to person, place, and time," and "was alert, [with] appropriate concentration, development for his age, safety awareness, follows commands, normal judgment." VRP (May 14, 2024) at 134. Taber further testified that her notes said when she met with Burgman, he "'took some time to wake up but was alert and oriented when he did.'" VRP (May 14, 2024) at 136 (quoting record). She explained that this meant Burgman knew who Taber was, knew what she was there to do, knew where he was, and knew the other people around him, including Joe, Teresa, Kathleen, and Jennie. When Taber conducted the intake, Burgman was "'bed bound'" and could not make himself meals or use the bathroom on his own. VRP (May 14, 2024) at 140 (quoting record).

When assessing Burgman, Taber marked that he had no cognitive impairment. She confirmed that she did not do any official cognitive testing on Burgman.

Here, the trial court's finding directly reflects Taber's trial testimony that her records said Burgman was alert and oriented on January 11, 2019. And we do not disturb the trial court's determinations of credibility. *Barnes*, 185 Wn.2d at 9. Nor do we second guess the weight the trial court gave Taber's testimony given that she did not specifically remember her interaction with Burgman and did not conduct official cognitive testing. *Id.* Accordingly, this finding was supported by substantial evidence.

### 3. Finding of fact 61

Finally, Kathleen and Teresa challenge the trial court's finding of fact 61:

Based upon the testimony and evidence, [Burgman] was restored to capacity to manage his affairs under the terms of the [durable power of attorney] by the time of his discharge.

CP at 993 (FF 61).

The Estate argues that substantial evidence supports this finding of fact, including the medical records from December 18 stating that Burgman's condition causing confusion was "'stable/resolved,'" and Dr. Newton's December 17 letter stating that in a general sense, "'[Burgman was] able to express [] his preferences and provide appropriate reasoning for his wishes.'" CP at 992 (FF 58, 60) (quoting record). We disagree that these were enough to legally restore Burgman's capacity under the specific terms of the durable power of attorney.

In August 2018, based on letters from Dr. Song and Dr. Buttitta, a trial court found that Burgman had "become unfit to serve" as personal representative of his mother's estate "because he [was] no longer of sound mind and competent to serve." CP at 784. The parties agree that this invoked the durable power of attorney for Teresa and Kathleen regarding Burgman's mother's estate.

The durable power of attorney stated that it was in effect until it was revoked by written notice. The document also said that a finding of competence by Burgman's attending physician would reinstate his capacity *if there was not a judicial finding* that Burgman was incapacitated.

Here, a court found that Burgman was incapacitated, so the medical documents stating that he was stable in December 2018 did not automatically render the durable power of attorney ineffective. The durable power of attorney stated that it would remain in effect until revoked, and there is no evidence that any person took action to officially revoke the statements of Burgman's physicians or the trial court's finding. Accordingly, the trial court's finding that Burgman was restored to manage his own affairs under the terms of the durable power of attorney document is not supported by substantial evidence.

However, the Estate argues that whether Burgman was restored to manage his affairs under the terms of the durable power of attorney is "mostly irrelevant in assessing whether he possessed testamentary capacity to execute a will," an issue we address below. Br. of Resp't at 20.

C.    Burgman Had Testamentary Capacity

Kathleen and Teresa argue that the unchallenged findings do not support the trial court's ultimate conclusion that Burgman had testamentary capacity. Specifically, they contend that the unchallenged findings of fact actually support the conclusion that Burgman lacked testamentary capacity, particularly because Teresa and Kathleen had invoked the durable power of attorney for Burgman based on Burgman's mental condition in August 2018. The Estate counters that "there is no requirement that evidence of testamentary capacity be proffered in any specific form." Br. of Resp't at 24.

First, we acknowledge the longstanding principle that even appointment of a guardian to manage the testator's own estate does not necessarily establish the testator's lack of testamentary capacity. *Bottger*, 14 Wn.2d at 697. Thus, a trial court's finding that Burgman was not of sound mind to manage distribution of his mother's estate, without any express mention of his capacity to make a will, does not require us to conclude that he lacked testamentary capacity.

Additionally, even if this finding invoked a presumption that Burgman lacked testamentary capacity, the trial court's conclusion that Burgman had testamentary capacity was supported by clear, cogent, and convincing evidence sufficient to overcome any presumption.

On December 14, 2018, a speech language pathologist who spoke with Burgman stated that he was oriented to time, place, and situation and was able to give rational solutions to various scenarios. On December 17, Dr. Newton stated that Burgman was able to answer basic orientation

questions and clearly state his wishes. Though at trial Dr. Newton indicated that his letter was not intended to be an assessment of Burgman's competency, we do not reweigh evidence on appeal. *Barnes*, 185 Wn.2d at 9. Medical records from December 18 noted that the condition causing Burgman's confusion was "'stable/resolved'" with medication. CP at 992 (FF 60) (quoting record). Frawley and Ziese, who both interacted with Burgman when he was drafting and executing the December 2018 will, testified that they had no concerns about Burgman's testamentary capacity. Therefore, four disinterested people offered testimony or evidence supporting the conclusion that Burgman had testamentary capacity in December 2018.

Kathleen and Teresa further argue that the trial court should not have presumed Burgman had testamentary capacity because the will was not rational on its face. Specifically, they cite the monthly stipend to Jennie as a potentially unenforceable provision that undermines the will's rationality. However, Kathleen and Teresa do not challenge the trial court's finding that Burgman specifically and knowingly disagreed with Frawley's advice to create a trust for Jennie instead of risking a potentially unenforceable lifetime monthly stipend from the family business. Frawley testified that Burgman understood what a trust was and understood Frawley's advice but declined to follow it "because he believed his family would follow the wishes expressed in his will." CP at 994 (FF 65). Accordingly, evidence demonstrates that Burgman made an informed and intentional choice to include the provision providing a monthly stipend for Jennie. Perhaps others would have made a different decision, but Burgman's decision on this issue was not entirely irrational.

Kathleen and Teresa also argue that the weakness of Burgman's signature on the December 2018 will demonstrates a lack of testamentary capacity. They cite *In re Est. of Geissler*, 104 Wash. 452, 177 P. 330 (1918), for this conclusion. However, in *Geissler*, the Washington Supreme Court

determined that the strength of the testator's signature was one piece of evidence demonstrating that she was not delirious or under the influence of drugs, but this was in response to an argument that other aspects of her signature suggested "an imperfect or nonunderstanding mind." *Id.* at 458. The case does not stand for the reverse proposition that a weak signature shows that the testator was delirious or under the influence. Accordingly, this argument fails.

We conclude that the trial court did not err by concluding that Burgman had testamentary capacity to execute the December 2018 will.

### III. UNDUE INFLUENCE

Kathleen and Teresa argue that the trial court erred by concluding that Burgman was not unduly influenced by Joe and George when creating his December 2018 will.

A.      Presumption of Undue Influence

First, Kathleen and Teresa argue that the trial court erred by denying their motion to impose the presumption of undue influence. The trial court concluded:

> The Court previously concluded that the presumption of invalidity does not apply to this case. Now that the trial has concluded, the Court repeats that conclusion based on the testimony and evidence at trial. Even if this Court applied the presumption of invalidity, it has been overcome by evidence that [Burgman's] decisions made in his 2018 Will were intentional and rational.

CP at 996 (CL 9).

Right before trial, in April 2024, Kathleen and Teresa submitted a motion asking the trial court to presume undue influence. The Estate argued that the presumption of undue influence should not be applied, but even if it were, there were clear facts rebutting the presumption. It is undisputed that the trial court denied Kathleen and Teresa's motion to apply the presumption of invalidity to the December 2018 will.

23

"The right to testamentary disposition of one's property is a fundamental right protected by law." *Barnes*, 185 Wn.2d at 9. If a will is executed according to all legal formalities, we presume that the will is valid. *Id.* (citing RCW 11.24.030). However, even a will executed by a person with testamentary capacity may be invalid if "undue influence" existed at the time of execution. *Id.* "Undue influence" is influence that, "'at the time of the testamentary act, controlled the volition of the testator, interfered with [their] free will, and prevented an exercise of [their] judgment and choice.'" *Id.* at 10 (internal quotation marks omitted) (quoting *In re Est. of Lint*, 135 Wn.2d 518, 535, 957 P.2d 755 (1998)).

The party challenging the validity of a will has the burden of proving the will's illegality by "clear, cogent, and convincing" evidence. *Dean v. Jordan*, 194 Wash. 661, 669, 79 P.2d 331 (1938). Parties contesting a will may use circumstantial evidence to establish suspicious facts that raise a presumption of undue influence. *Barnes*, 185 Wn.2d at 10. If the evidence presented raises a presumption of undue influence, the will proponent must produce evidence to rebut the presumption. *Id.* "The absence of rebuttal evidence may be sufficient to set aside a will, but the contestant retains the ultimate burden of proof." *Id.*

In *Dean*, the Washington Supreme Court identified suspicious facts and circumstances that can raise a presumption of undue influence, including "(1) that the beneficiary occupied a fiduciary or confidential relation to the testator; (2) that the beneficiary actively participated in the preparation or procurement of the will; and (3) that the beneficiary received an unusually or unnaturally large part of the estate." 194 Wash. at 672. The *Dean* court also listed other considerations "such as the age or condition of health and mental vigor of the testator, the nature or degree of relationship between the testator and the beneficiary, the opportunity for exerting an

undue influence, and the naturalness or unnaturalness of the will." *Id.* "Whether the existence of the so-called *Dean* factors raises a presumption of undue influence is a highly fact-specific determination that requires careful scrutiny of the totality of the circumstances." *Barnes*, 185 Wn.2d at 11.

1.      Factor 1: fiduciary or confidential relationship

The crux of a confidential relationship "is a level of trust that leads the testator to believe that the beneficiary is acting in [their] best interests, creating an opportunity for the beneficiary to exert undue influence." *Id.* While family relationships are particularly likely to create confidential relationships, "parentage alone does not create the relationship." *Lewis v. Est. of Lewis*, 45 Wn. App. 387, 390, 725 P.2d 644 (1986). "The essential elements of a confidential relationship are (1) that the parent reposes some special confidence in the child's advice *and* (2) that the child purports to advise with [their] parent's interests in mind." *Id.* at 391. Specifically, a confidential relationship between parent and child exists when the parent becomes "dependent upon the child, either for support and maintenance, or for care or protection in business matters as well, or for both, and the child, by virtue of factors of personality and superior knowledge . . . [assumes] . . . the role of adviser accepted by the parent." *McCutcheon v. Brownfield*, 2 Wn. App. 348, 357, 467 P.2d 868 (1970).

Here, Joe, who was Burgman's son, provided most of Burgman's physical assistance and transportation as Burgman was in and out of the hospital. Joe also made Burgman's appointments with Frawley and created a draft outline of Burgman's 2018 will. Burgman was physically vulnerable during this time and dependent on Joe for transportation and care. However, all of Burgman's children were helping him with various things during this time, and there is no evidence

that Burgman placed special confidence in Joe's advice or that Joe otherwise advised Burgman.

Accordingly, this factor is neutral or weighs only slightly in favor of applying the presumption.

        2.        Factor 2: beneficiary's participation in procurement or preparation of will

"The second *Dean* factor requires that the beneficiary's actions bring about or affect the testamentary instrument." *Barnes*, 185 Wn.2d at 12. In *In re Est. of Malloy*, the Washington Supreme Court concluded that, despite the fact that the will proponent helped select the attorney who assisted with the will and drove the decedent to the attorney's office on multiple occasions, there was no evidence that the will proponent participated in the preparation or procurement of the will. 57 Wn.2d 565, 570, 358 P.2d 801 (1961). In *Barnes*, the Washington Supreme Court further stated that simply driving the decedent to a meeting with her attorney was not sufficient to satisfy this factor on its own. 185 Wn.2d at 12. However, when viewed in the context of a consistent "campaign to influence" the decedent, the fact that the beneficiary drove the decedent to the execution of the will weighed for imposing the presumption. *Id.* at 13.

In *In re Est. of Haviland*, Division One held that the second *Dean* factor weighed for applying the presumption of undue influence where the beneficiary mailed a copy of the testator's previous will to an attorney with suggested changes. 162 Wn. App. 548, 566, 255 P.3d 854 (2011).

Here, the trial court found, and Kathleen and Teresa do not challenge, that in 2018, Joe was Burgman's primary caretaker and source of transportation, but all of Burgman's children participated in his care and interacted with him regularly. The trial court also found that Joe arranged Burgman's first meeting with Frawley in December 2018 to create a new will. George and Joe both attended this meeting.

Joe initially drafted an outline of Burgman's new will that would have given Joe 60 percent of the shares in the family business. Frawley had this outline in his records. In the final December 2018 will that Burgman executed, Joe received 52 percent of the shares in the family business.

Here, like in *Haviland*, Joe gave Frawley a draft of a will with suggested changes from Burgman's prior 2017 will. Joe also arranged Burgman's meetings with Frawley about the December 2018 will and likely transported him there. These facts together sufficiently indicate that Joe actively participated in the preparation and procurement of the December 2018 will in a manner that weighs in favor of applying the presumption of undue influence.

3.      Factor 3: unusual or unnaturally large gift

We determine the "unusualness" or "unnaturalness" of a beneficiary's gift by comparing it to gifts in the decedent's prior testamentary instruments and the decedent's bequests to other beneficiaries. *Barnes*, 185 Wn.2d at 13. "A will is unnatural 'when it is contrary to what the testator, from [their] known views, feelings, and intentions would have been expected to make.'" *Id.* at 14 (quoting *In re Est. of Miller*, 10 Wn.2d 258, 267, 116 P.2d 526 (1941)).

Here, Burgman specifically excluded Joe from his prior wills. The trial court found that Burgman had excluded Joe from prior wills because "Joe's prior involvement with [the family business] caused significant financial losses." CP at 980 (FF 6). Evidence indicates that the trial court knew these financial losses were a result of Joe stealing from the business. In Burgman's 2017 will, he split the shares of the family business evenly among George, Kathleen, and Teresa.

Frawley testified that in December 2018, Burgman was unhappy with Kathleen and Teresa. However, the provision granting Joe, who had previously caused the business significant financial losses and was expressly excluded from Burgman's prior wills, a majority share of the business is

unnatural when viewed in light of the totality of the circumstances. Accordingly, this *Dean* factor weighs for applying a presumption of undue influence.

4. Other factors

Other factors that courts may consider when assessing whether to apply a presumption of undue influence include the decedent's age, condition of health, mental vigor, and the nature or degree of the testator's relationship with the beneficiary, and the beneficiary's opportunity for exerting undue influence. *Dean*, 194 Wash. at 672.

Here, Burgman was in his late 70s in December 2018 when he executed the contested will, and he was not physically healthy. However, testimony and medical records demonstrate that he was alert and oriented and able to express his own wishes at the time he executed the will. When Burgman created the will, Joe was Burgman's son and primary caretaker in the family, so would likely have spent a lot of time with Burgman and had the opportunity to exert influence over him. Thus, the additional *Dean* factors generally weigh in favor of applying the presumption.

All of the *Dean* factors weigh at least slightly in favor of imposing the presumption. As a result, the trial court erred by failing to apply a presumption of undue influence. However, the Estate's evidence was sufficient to rebut this presumption.

B. Burgman Was Not Unduly Influenced

The Estate argues that even if the trial court erred by failing to apply a presumption of undue influence, the trial court also concluded that, even applying the presumption, Kathleen and Teresa did not provide clear, cogent, and convincing evidence that George and Joe unduly influenced Burgman regarding the December 2018 will. Thus, the Estate contends that in the context of all of the relevant facts, any error in not applying the presumption was harmless.

If the facts raise a presumption of undue influence, then the burden shifts to the proponent of the will to rebut the presumption with evidence sufficient to "'balance the scales and restore the equilibrium of evidence touching the validity of the will.'" *Barnes*, 185 Wn.2d at 15 (quoting *Dean*, 194 Wash. at 672). However, the party contesting the will still bears the burden of proving undue influence by clear, cogent, and convincing evidence. *Id.*

Circumstantial evidence alone can support a finding of undue influence. *Id.* at 16. However, mere suspicion of undue influence is not sufficient to invalidate a will. *Id.* The will contestant cannot rely solely on the presumption and must produce direct or circumstantial "'positive evidence'" of undue influence. *Id.* (quoting *Dean*, 194 Wash. at 673). We review de novo whether the evidence amounts to undue influence. *Melter*, 167 Wn. App. at 301.

Kathleen and Teresa cite *In re Estate of Escala*, 16 Wn. App 764, 559 P.2d 592 (1977), as support for their argument that Burgman was unduly influenced by George and Joe. There, this court affirmed the trial court's conclusion that Escala had been unduly influenced by the beneficiaries of his most recent will. *Id.* at 765. The beneficiaries had a fiduciary relationship with Escala, had ripped up his prior will and dictated the terms of the new one, received the entirety of his estate despite his close familial relationship with his niece who was the sole beneficiary of his prior will, and Escala was very physically weak at the time he executed the new will. *Id.* at 767-69. The trial court concluded that the beneficiaries of the new will did not present evidence sufficient to rebut the presumption of undue influence created by these facts. *Id.* at 771. The beneficiaries cited testimony from two witnesses, Escala's friend and an acquaintance of Escala with ties to the beneficiaries, that Escala independently intended to make these changes and was disappointed with his niece. *Id.* at 770. However, the trial court did not find this testimony credible

when compared with contradictory testimony and evidence of Escala's relationships and wishes. *Id.* at 770-71.

Kathleen and Teresa also cite *Barnes* to support their undue influence claim. In *Barnes*, the decedent's most recent will completely excluded the beneficiaries listed in her prior will, the Rovas, and instead gave the assets to Wells. 185 Wn.2d at 7. Wells was the decedent's rural mail carrier and became friends with the decedent after the decedent's husband and daughter passed away. *Id.* Wells also became the decedent's caretaker after the decedent fell in her home. *Id.* As Wells got closer to the decedent, the decedent became estranged from her family and was isolated from outside contact. *Id.* at 7-8. Additionally, Wells made multiple false statements that fueled the decedent's "unfounded anger and mistrust" of the Rovas. *Id.* at 7. Wells eventually became the decedent's attorney-in-fact. *Id.* Over the course of their relationship, the decedent wrote several checks to Wells for various services and expenses. *Id.* at 8. The Washington Supreme Court concluded that these facts demonstrated "Wells' systematic influence over [the decedent] and active efforts to isolate and alienate [the decedent] from the Rovas," and constituted clear, cogent, and convincing evidence of undue influence. *Id.* at 17.

Here, Burgman executed his will on December 20, 2018. George and Joe took steps to facilitate the creation and execution of Burgman's December 2018 will. But Frawley, who discussed the details of the December 2018 will with Burgman on multiple occasions, testified that Burgman himself dictated the terms of the will and his preferences. Both Frawley and Ziese said they had no concerns that Burgman was not the one directing the terms of the will. We defer to the trial court's determinations of credibility of these witnesses and to the weight the trial court gave their testimony. *See Barnes*, 185 Wn.2d at 9.

Additionally, Burgman's final December 2018 will was different than Joe's draft, indicating that Burgman did not blindly accept the terms that Joe outlined. And Burgman's intentional insistence on including a monthly stipend to Jennie, which was a new term largely unrelated to George's and Joe's interests in the will, further signals that Burgman was considering interests beyond George's and Joe's. Accordingly, this case differs from *Escala*, where the contested beneficiaries ripped up Escala's prior will and wholly dictated the terms of the new will. 16 Wn. App. at 767-68. The terms of the final December 2018 will intentionally distributing property among Burgman's children also distinguish this case from *Escala*, where the beneficiaries of the challenged will received the entirety of Escala's estate. *Id.* at 768.

Further, here, Frawley indicated that Burgman independently expressed that he was unhappy with Kathleen and Teresa. This was consistent with what Burgman had previously stated at the family meeting when he learned they invoked his power of attorney to appoint themselves representatives of his mother's estate. Burgman also expressed concerns with how the family business was being managed, potentially explaining some of the changes in Burgman's will outside of his relationships with George and Joe. We acknowledge that in *Escala*, the trial court concluded, and this court affirmed, that contested testimony from an acquaintance stating that Escala was disappointed with his prior beneficiary was not sufficient to rebut the presumption of undue influence. 16 Wn. App. at 770-71. While we do not reweigh evidence on appeal, we note that Frawley, a disinterested third party, testified convincingly about Burgman's expressed motivations and whether Burgman was unduly influenced. The strength of Frawley's testimony also distinguishes this case from *Escala*.

This case also differs from *Barnes* on several important points. While Joe was Burgman's primary caretaker at the time, unlike the beneficiary in *Barnes*, George and Joe did not isolate Burgman from the rest of his family. Additionally, Kathleen and Teresa do not indicate that Joe received ongoing financial benefits from Burgman before the December 2018 will was executed, nor do they provide evidence that either George or Joe was making false and inflammatory statements about Kathleen and Teresa to Burgman before he executed the will.[6] While Joe, as Burgman's son and primary caretaker, was close to Burgman near the end of his life and helped facilitate the creation and execution of the December 2018 will, the evidence here does not demonstrate that Joe had a "systematic influence" over Burgman or took "active efforts to isolate and alienate" Burgman from his family like the beneficiary did in *Barnes*. 185 Wn.2d at 17.

Accordingly, we agree with the trial court that even applying a presumption of undue influence, the evidence cited above, in addition to the evidence of Burgman's testamentary capacity at the time he executed the December 2018 will, demonstrates that Burgman made independent and informed decisions regarding the will. As a result, we also agree with the trial court's conclusion that Kathleen and Teresa have not provided clear, cogent, and convincing evidence that Burgman was subject to undue influence from George and Joe.

---

[6] In their briefing, Kathleen and Teresa state that the "evidence shows there was no way for [Burgman] to have any understanding about how [the family business'] operations were being handled unless, of course, Joseph was telling [Burgman] his opinions to seek a change in the Will." Appellant's Opening Br. at 21. However, Burgman would sometimes go into the office during the period right before he executed the December 2018 will. And Kathleen and Teresa offer no evidence that Joe was the sole source of Burgman's information about how the business was being run in late 2018.

### IV. Exclusion of Witness Testimony

Kathleen and Teresa argue that the trial court erred by denying their motion to exclude Vandenbelt as an expert witness because the Estate did not comply with the trial court's order to disclose Vandenbelt's opinions 24 hours before his testimony. Kathleen and Teresa contend that this error was not harmless.

As the Estate points out, we do not have Vandenbelt's testimony in the record on appeal, nor do we have the trial court's discussion of whether to exclude his testimony. "The appellant bears the burden of perfecting the record on appeal so as to ensure that the reviewing court is apprised of all necessary evidence to decide the issues presented." *Tacoma S. Hosp., LLC v. Nat'l Gen. Ins. Co.*, 19 Wn. App. 2d 210, 220, 494 P.3d 450 (2021); *see* RAP 9.2(b). Where the appellant fails to perfect the record, the reviewing court may decline to address the merits of an issue. *Tacoma S. Hosp., LLC*, 19 Wn. App. 2d at 220. "Barring compelling circumstances, however, courts should avoid deciding a case based on noncompliance with the Rules of Appellate Procedure." *Id.* at 220-21.

Here, we are missing key evidence regarding the trial court's ruling on the admissibility of Vandenbelt's testimony and Vandenbelt's testimony itself. This constitutes a compelling circumstance such that we decline to review this issue on appeal.

Additionally, decisions to exclude evidence based on a violation of discovery rules are subject to harmless error analysis. *See Jones v. City of Seattle*, 179 Wn.2d 322, 356, 314 P.3d 380 (2013) (holding that exclusion of testimony from late-disclosed witnesses was harmless). Here, the trial court found that "Dr. Vandenbelt provided very limited helpful testimony. He did testify credibly that [Burgman's] hepatic encephalopathy that he suffered from in July and August 2018

had improved significantly by December 2018, based on his review of medical records." CP at 992 (FF 59). Other evidence on the record demonstrates that the condition causing Burgman's confusion had improved significantly by December 2018. On December 14, a speech language pathologist noted that Burgman was well oriented to time, place, and situation and could provide solutions to various scenarios. On December 17, Dr. Newton wrote a letter that Burgman was able to answer basic questions of orientation and state his wishes. And medical records from December 18 state that Burgman's condition was "'stable/resolved'" with medication. CP at 992 (FF 60) (quoting record).

Accordingly, the trial court's finding related to Vandenbelt's testimony was cumulative of other evidence on the record. So even if the trial court's failure to exclude his testimony was error, the error was harmless.

## ATTORNEY FEES

The Estate argues that we should award it appellate attorney fees under RCW 11.96A.150(1), which gives appellate courts discretion to award reasonable attorney fees to any party involved in a proceeding about a will. *See* RAP 18.1(a). The Estate also asks for appellate attorney fees and costs under RCW 11.24.050, which allows courts to award attorney fees and costs if the party contesting the will did not act with probable cause or good faith.

We do not award appellate fees or costs to the Estate. Though Kathleen and Teresa do not succeed on appeal, their arguments are not frivolous and present reasonably debatable issues.

## CONCLUSION

We affirm and we decline to award attorney fees on appeal.

No. 59916-3-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

GLASGOW, J.

We concur:

MAXA, P.J.

LEE, J.

35